ADVISORY OPINION ON CONSTITUTIONALITY OF 1986 PA 281

Docket No. 80210. Argued June 2, 1987 (Calendar No. 1). Decided March 22, 1988.

The Supreme Court granted requests by the Governor and the Senate to determine whether the capture of revenues by a local development finance authority and the use of the revenues by the authority as authorized by 1986 PA 281, the Local Development Financing Act, divert tax revenues from the taxing entities in violation of Const 1963, art 9, § 6, or lend the credit of the state or a municipality in violation of Const 1963, art 9, § 18 or art 7, § 26.

In an opinion by Justice BRICKLEY, joined by Justices CAVANAGH, BOYLE, ARCHER, and GRIFFIN, the Supreme Court *held:*

The capture and use of tax increment revenues as authorized by the Local Development Financing Act do not violate the provisions of Const 1963, art 7, § 26 or art 9, §§ 6, 18.

1. The Local Development Financing Act was intended to encourage local development and promote economic growth. It authorizes the creation of local development finance authorities and grants them certain powers to carry out government programs that further the purpose of the act. Tax increment financing is one of the authorized means of financing these programs. Such a program enables a local government to finance public improvements in a designated area by capturing the property taxes levied on any increase in property values within the area. Under the plan, a base year is established for the project area, and, in subsequent years, an increase in assessment above the base year level is referred to as the captured value. All, or a portion, of the property taxes levied on the captured values is diverted to the area's development plan. Details of implementation of a plan, including the amount of bonded indebtedness and the manner in which the monies may be spent, are prescribed by the act.

2. Const 1963, art 9, § 6 provides that the total amount of

REFERENCES

Am Jur 2d, Municipal Corporations §§ 583, 588.

See the annotations in the Index to Annotations under Municipal Corporations.

general ad valorem taxes imposed upon real and tangible personal property for all purposes in any one year may not exceed fifteen mills on each dollar of the assessed valuation of property as finally equalized. However, separate tax limitations may be adopted for a county, a township, and a local school district which in the aggregate do not exceed eighteen mills, unless a greater amount, not to exceed fifty mills, is approved by the electors. The tax financing provisions of the LDFA do not violate these provisions. By capturing tax revenues attributable to the increased value that is assumed to result from the development plan, tax increment financing has no effect on the total amount of general ad valorem taxes imposed. The amount of taxes paid by taxpayers will be the same regardless of whether a tax increment plan is adopted. Tax increment financing does not violate art 9, § 6 by diverting taxes from the purposes for which they were levied or by diverting to the authority revenues levied by local taxing units. The first paragraph of art 9, § 6 does not address the question of purpose, rather it places a limitation on the tax rate, not on tax revenues or their use. With regard to millage enacted pursuant to the first paragraph of art 9, § 6, the Legislature retains the power to allocate revenues and to alter the purposes to which they are put.

3. Const 1963, art 9, § 18 provides that the state and its instrumentalities such as local governments may not lend credit except as provided in the constitution. One such exception to the general rule is provided by art 7, § 26 which requires that a loan of a municipality's credit must be authorized by law and further a public purpose. While tax increment bonds constitute a loan of credit, their issuance does not amount to a violation of art 9, § 18, because it is the credit of the municipality which created the local development authority, not that of the state, which is involved, and such a loan of credit is authorized by law and furthers a public purpose.

1986 PA 281 declared constitutional.

Justice LEVIN, joined by Chief Justice RILEY, dissenting in part, agreed that the capture of ad valorem tax revenues by a local development finance authority and the use of such revenues by the authority for purposes authorized by the Local Development Financing Act do not unconstitutionally lend the credit of the state or of a municipality, and also agreed that the act does not unconstitutionally divert ad valorem tax revenues from taxing entities insofar as the generation of the revenues is not dependent on millage authorized by a vote of the electors, but disagreed insofar as ad valorem tax revenues generated as

a result of a vote of the people are so diverted. The constitution requires that ad valorem tax revenues generated as a result of tax limitations adopted or increased by the vote of the electors of a taxing entity be used only for the purposes of the entity and may not be diverted to other local or statewide uses or purposes.

CONSTITUTIONAL LAW — MUNICIPAL CORPORATIONS — TAX INCREMENT FINANCING — DIVERSION OF REVENUES — LENDING OF CREDIT.

The capture of tax increment revenues by a local development finance authority and the use of the revenues by the authority for purposes authorized by the Local Development Financing Act are not unconstitutional diversions of tax revenues from the taxing entity or unconstitutional lendings of credit by the state or a municipality (Const 1963, art 7, § 26, art 9, §§ 6, 18; 1986 PA 281, MCL 125.2151 *et seq.;* MSA 3.540[351] *et seq.*).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *James L. Stropkai, Chester W. Lewis,* and *Thomas F. Schimpf,* Assistant Attorneys General, for the Attorney General in support of constitutionality.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch,* Assistant Attorney General, for the Attorney General in opposition to constitutionality.

Amici Curiae:

*Patterson, Phifer & Phillips, P.C.* (by *Kurt D. Meyer*), for Annis Historic Properties.

*Lewis, White & Clay, P.C.* (by *David Baker Lewis, Reuben A. Munday,* and *Tina M. Pompey*), for the City of Detroit Downtown Development Authority, the Tax Increment Finance Authority, and the Economic Development Corporation.

*Reck, Reck & Erwin, P.C.* (by *J. David Reck*), for the City of Howell.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Judson M. Werbelow, John A. Everhardus,* and *Kester K. So*) for the City of Lansing Tax Increment Finance Authority, Auburn Hills Local Development Finance Authority, City of Pontiac Tax Increment Finance Authority, City of St. Ignace Downtown Development Authority, City of Marysville Local Development Finance Authority, Lakeview Downtown Development Authority, and Michigan Municipal League.

*Honigman, Miller, Schwartz & Cohn* (by *Norman Hyman, William G. Christopher, Mitchell R. Meisner,* and *E. Powell Miller*), for the City of St. Clair Shores and the Tax Increment Finance Authority.

*Mika, Meyers, Beckett & Jones* (by *James K. White, Ronald J. Clark,* and *Dale A. Mattis*) for Gaines Township and the Local Development Financing Authority.

*Cohl, Salstrom, Stoker & Aseltyne, P.C.* (by *Larry A. Salstrom*), for Livingston County.

*Fitzgerald, Hodgman, Cox, Cawthorne & McMahon* (by *Dennis O. Cawthorne* and *James G. Cavanagh*) for Michigan Association of Counties.

*Clark, Hardy, Lewis, Pollard & Page, P.C.* (by *Dennis R. Pollard*), for Michigan Association of School Administrators, Michigan Community College Association, Michigan Federation of Teachers, Michigan Out-of-Formula District Association, Middle Cities Association, Michigan Federation AFSA Locals, AFL-CIO, City of Pontiac School District, and Avondale School District.

*Linda L. Bruin* for Michigan Association of School Boards.

*Foster, Swift, Collins & Coey, P.C.* (by *Stephen O. Schultz* and *Matthew F. Pausch*), for Michigan Education Association.

*Bauckham, Reed, Lang, Sparks, Rolfe & Thomsen, P.C.* (by *Richard D. Reed* and *James W. Porter*), for Michigan Townships Association.

BRICKLEY, J. Pursuant to Const 1963, art 3, § 8,[1] the Governor, by way of a letter dated January 28, 1987, and the Senate, by way of Senate Resolution No. 30 of January 28, 1987, have requested an advisory opinion on two particular questions regarding the constitutionality of certain provisions of 1986 PA 281, MCL 125.2151 *et seq.;* MSA 3.540(351) *et seq.* That act, entitled the Local Development Financing Act (LDFA), was signed by the Governor on December 20, 1986, with an effective date of February 1, 1987.

The questions presented are:

   1. Do[ ] the capture of revenues by a local development finance authority (formerly "tax increment financing authority") and use of such revenues by the authority for purposes authorized by the act unconstitutionally divert tax revenues from taxing entities in violation of the Const 1963, art 9, § 6?
   2. Do[ ] the capture of revenues by a local development finance authority (formerly "tax increment financing authority") and use of such revenues by the authority for purposes authorized in the act unconstitutionally lend the credit of the state or a municipality in violation of Const 1963, art 9, § 18 or art 7, § 26?

---

[1] Const 1963, art 3, § 8 provides:

   Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.

By order of March 4, 1987, we agreed to consider the requests for an advisory opinion and asked the Attorney General to brief both sides of the questions. Other interested parties were also invited to file briefs amicus curiae. The order further indicated that this Court would decide after oral argument whether to grant the requests.

In light of the specificity of the issues,[2] and the fact that resolution of these narrow but important[3] questions of law does not depend upon "factual situations the Court would be forced to hypothesize,"[4] we agree to consider the questions presented. We conclude that the provisions of LDFA that allow the capture and use of tax increment revenues do not violate Const 1963, art 9, § 6. In addition, application of the same provisions does not on its face constitute an unconstitutional lending of credit in violation of Const 1963, art 9, § 18, or art 7, § 26.

---

[2] As we have noted in the past,

the request for an advisory opinion must "particularize any claims of unconstitutionality." *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 484 [208 NW2d 469 (1973)]; *Advisory Opinion re Constitutionality of 1974 PA 242,* 394 Mich 41, 53; 228 NW2d 772 (1975). A request stated too broadly cannot be considered. *Advisory Opinion re Constitutionality of 1974 PA 272,* 393 Mich 916 (1975). [*Request for Advisory Opinion on Constitutionality of 1975 PA 227,* 395 Mich 148, 149; 235 NW2d 321 (1975); *Request for Advisory Opinion on Constitutionality of 1979 PA 57,* 407 Mich 60, 65; 281 NW2d 322 (1979).]

[3] Regardless of the relative policy merits of tax increment financing, we are persuaded by the arguments of the Attorney General (in favor of constitutionality) and of various amici curiae, on both sides of the constitutional issue, that tax increment financing is a vital source of funding for many communities. See Department of Treasury, *Analysis of Tax Increment Financing in Michigan for 1986* (April, 1987), p A-3 (162 local governments have established authorities that may utilize tax increment financing). We therefore agree that the issues presented are sufficiently important to support the issuance of an advisory opinion.

[4] *Request for Advisory Opinion on Constitutionality of 1979 PA 57,* n 2 *supra,* p 66.

However, in addition to the more obvious fact that our decision is not based on the policy merits of tax increment financing, we caution that the instant holdings are limited. The particular facts of a future litigation case, or questions premised upon other constitutional provisions or questions of statutory construction not presented in the request for advisory opinion, may present different problems that are not addressed here.

I

The Legislature enacted the LDFA "to encourage local development to prevent conditions of unemployment and promote economic growth . . . ." Preamble to 1986 PA 281. It authorized the creation of local development finance authorities to carry out government programs that further the purposes of the act, and it grants to them certain powers.

Tax increment financing is one of the authorized means of financing these programs, see MCL 125.2160(c), (d); MSA 3.540(360)(c), (d), and represents the primary aspect of the LDFA that is in question here. The Legislature has authorized tax increment financing in the past, in the act establishing downtown development authorities, 1975 PA 197, MCL 125.1651 *et seq.;* MSA 5.3010(1) *et seq.,* and in the Tax Increment Finance Authority Act (TIFAA), 1980 PA 450, MCL 125.1801 *et seq.;* MSA 3.540(201) *et seq.*

According to the bill analysis prepared by the House Legislative Analysis Section on House Bills 5728 and 5729, October 16, 1986, which became 1986 PA 281, the LDFA was designed to improve upon, and to eliminate some of the problems of the TIFAA. The analysis notes that the LDFA

would duplicate much of the [TIFAA], yet would differ by expanding local government influence on authority decisions, narrow the scope of projects for which tax increment financing may be used and make other changes.

Initially, the LDFA empowers municipalities to establish not more than one local development financing authority, MCL 125.2153(1); MSA 3.540(353)(1), according to a prescribed notice and hearing process. MCL 125.2154(1), (2); MSA 3.540(354)(1), (2). After the hearing, should the municipality decide to proceed with creation of the authority, it must adopt a resolution establishing the authority and designating the boundaries of the authority district or districts. *Id.,* subsection (3). The authority is under the supervision and control of a board appointed by the chief executive officer of the municipality. MCL 125.2155; MSA 3.540(355).

Sections 12, 13, 14, and 17 of the LDFA govern tax increment financing by the local development financing authorities. Basically, once a tax increment financing plan[5] has been approved, the property values covered by the tax increment financing plan are, in effect, frozen.[6] Future ad valorem tax revenues that are attributable to any subsequent increase in value above the base value are turned

---

[5] The requirements for a tax increment plan are outlined in § 12(2) of the LDFA, MCL 125.2162(2); MSA 3.540(362)(2).

[6] The value of the property in the base year is referred to in the act as the "[i]nitial assessed value," which

> means the assessed value, as equalized, of the eligible property identified in the tax increment financing plan at the time the resolution establishing the tax increment financing plan is approved as shown by the most recent assessment roll for which equalization has been completed at the time the resolution is adopted. [MCL 125.2162(1)(b); MSA 3.540(362)(1)(b).]

over to the authority in order to further implement the development plan.[7] Stated another way,

[a] tax increment financing (TIF) plan allows a local government to finance public improvements in a designated area by capturing the property taxes levied on any increase in property values within the area. Under a TIF plan, a base year is established for the project area. In subsequent years, any increase in assessments above the base year level is referred to as the captured value. All, or a portion, of the property taxes levied on the captured value (SEV) is diverted to the area's development plan. [Department of Treasury, *Analysis of Tax Increment Financing in Michigan for 1986* (April, 1987), p A-2.]

Tax increment financing "is premised on the theory that, without the redevelopment project, property values would not increase,"[8] or "that

[7] "Captured assessed value" means the amount in any 1 year by which the current assessed value, as equalized, of the eligible property identified in the tax increment financing plan, . . . exceeds the initial assessed value. The state tax commission shall prescribe the method for calculating captured assessed value. [MCL 125.2162(1)(a); MSA 3.540(362)(1)(a).]

[8] Newman, *Tax increment financing for development and redevelopment,* 61 Or L R 123, 124 (1982). This assumption is frequently described in the case law. See, e.g., *Sigma Tau Gamma Fraternity House Corp v City of Menomonie,* 93 Wis 2d 392, 413-414; 288 NW2d 85 (1980); *State v Daytona Beach,* 484 So 2d 1214, 1215 (Fla, 1986); *Salt Lake Co v Murray City Redevelopment,* 598 P2d 1339, 1342 (Utah, 1979).

One commentator notes, however, that, in general, tax increment financing laws make "no provision . . . for periods in which district property values drop below their original level . . . ." Huddleston, *A comparison of state tax increment financing laws,* 55 State Gov't 29, 31 (1982).

Along the same lines, it should be noted that the LDFA permits, but does not require, a municipality to exclude from captured assessed value the portion of the increase that results solely from inflation rather than from the plan. See MCL 125.2162(2)(b); MSA 3.540(362)(2)(b).

increases in land values and assessments in the project area are *caused* by the redevelopment authority's own construction of economic activity in the district."[9] The LDFA details the requirements for implementing a tax increment financing plan.

First, the LDFA requires the authority board to submit a tax increment financing plan to the governing body of the municipality, to be approved in accordance with the notice, hearing, disclosure, and approval provisions that apply to development plans. See MCL 125.2162(2), (5); MSA 3.540(362)(2), (5). The tax increment financing plan must conform to certain requirements,[10] and

> shall only provide for the use of tax increment revenues for public facilities[11] for eligible property whose captured assessed value produces the tax increment revenues or, to the extent the eligible property is located within a certified industrial park, for other eligible property located in the certified industrial park. [MCL 125.2162(3); MSA 3.540(362)(3).]

If the construction of certain property will result in "transferring employment of 50 or more full-time jobs from 1 or more local governmental units . . . to the municipality in which the eligi-

[9] Davidson, *Tax increment financing as a tool for community redevelopment,* 56 U Det J Urb L 405, 410 (1979).

[10] The tax increment financing plan must include, among other things: a statement of the reasons that the plan will result in the development of captured assessed value which could not otherwise be expected; an estimate of the captured assessed value and the estimated tax increment revenues for each year of the plan; the maximum amount of note or bonded indebtedness to be incurred; the amount of indebtedness incurred by the municipality to be repaid from tax increment revenues; the duration of the tax increment plan; and an estimate of the effect of tax increment financing on the revenues of all taxing jurisdictions in which the eligible property is located. See MCL 125.2162(2)(a)-(k); MSA 3.540(362)(2)(a)-(k).

[11] See MCL 125.2162(3); MSA 3.540(362)(3). "Public facility" is given a broad definition under the act. See MCL 125.2152(k); MSA 3.540(352)(k).

ble property is located," the affected local governmental units must consent to the property's inclusion in the district for purposes of the tax increment plan. MCL 125.2162(4); MSA 3.540(362)(4).

Once a tax increment financing plan is adopted, it is "binding on all taxing units levying ad valorem property taxes or specific local taxes against property located in the authority district." MCL 125.2162(6); MSA 3.540(362)(6). However, those taxing authorities are provided an opportunity "to express their views and recommendations regarding the tax increment plan." *Id.* In addition, the authority may agree to share part of the captured assessed value of the district with those taxing jurisdictions and the governing municipality. *Id.*

Section 13 of the LDFA describes the mechanics of transmitting the tax increments to the authority.

> The amount of tax increment that shall be transmitted to the authority by the city, village, township, school district, and county treasurers shall be that portion of the tax levy of all taxing jurisdictions paid each year on the captured assessed value of each eligible property included in a tax increment financing plan excluding millage specifically levied for the payment of principal and interest of obligations approved by electors or obligations pledging the unlimited taxing power of the local governmental unit. [MCL 125.2163(1); MSA 3.560(363)(1).]

The same section requires that the tax increments be spent only as provided in the tax increment plan. It also provides for the disposition of excess tax increment revenues, the abolishment of the tax increment plan, and the annual financial report. See *id.,* subsections (2), (3).

Section 14 of the act, MCL 125.2164; MSA

3.540(364), governs tax increment bonds. It allows the authority to authorize, issue, and sell its tax increment bonds to finance a development program. The bonds are subject to the Municipal Finance Act, MCL 131.1 *et seq.;* MSA 5.3188(1) *et seq.* "The authority may pledge for debt service requirements the tax increment revenue to be received from an eligible property." MCL 125.2164(1); MSA 3.540(364)(1).

In regard to a municipality's support for tax increment bonds, § 14(2) provides:

> The municipality by majority vote of the members of its governing body may make a limited tax pledge to support the authority's tax increment bonds or, if authorized by the voters of the municipality, pledge its full faith and credit for the payment of the principal of and interest on the authority's tax increment bonds. [MCL 125.2164(2); MSA 3.540(364)(2).]

Section 14 further provides that bonds and notes issued by the authority and their interest on income are exempt from state and local taxes. *Id.,* subsection (3).

The remaining substantive sections of the act govern the requirements for development plans, MCL 125.2165; MSA 3.540(365), the specifics of the notice and hearing procedure, MCL 125.2166; MSA 3.540(366), the determination of public purpose and the approval process for development or tax increment plans, MCL 125.2167; MSA 3.540(367), relocation, MCL 125.2168; MSA 3.540(368), budgetary matters, MCL 125.2169; MSA 3.540(369), and dissolution of the authority, MCL 125.2170; MSA 3.540(370). Section 24 expresses the Legislature's intent to request an opinion of this Court regarding the constitutionality of the act. MCL 125.2174; MSA 3.540(374).

II

The first question presented is: Do the capture of revenues, i.e., revenues derived from captured assessed value, by a local development authority and use of such revenues for purposes authorized by the act, i.e., for public facilities or as authorized in § 14, unconstitutionally divert tax revenues from local taxing entities in violation of Const 1963, art 9, § 6? Because we do not interpret the applicable portions of art 9, § 6, as governing the capture and use of tax increment revenues, we find no violation of that constitutional provision.

Article 9, § 6, provides:

Except as otherwise provided in this constitution, the total amount of general ad valorem taxes imposed upon real and tangible personal property for all purposes in any one year shall not exceed 15 mills on each dollar of the assessed valuation of property as finally equalized. Under procedures provided by law, which shall guarantee the right of initiative, separate tax limitations for any county and for the townships and for school districts therein, the aggregate of which shall not exceed 18 mills on each dollar of such valuation, may be adopted and thereafter altered by the vote of a majority of the qualified electors of such county voting thereon, in lieu of the limitation hereinbefore established. These limitations may be increased to an aggregate of not to exceed 50 mills on each dollar of valuation, for a period of not to exceed 20 years at any one time, if approved by a majority of the electors, qualified under Section 6 of Article II of this constitution, voting on the question.

The foregoing limitations shall not apply to taxes imposed for the payment of principal and interest on bonds approved by the electors or other evidences of indebtedness approved by the electors or for the payment of assessments or contract

obligations in anticipation of which bonds are issued approved by the electors, which taxes may be imposed without limitation as to rate or amount; or, subject to the provisions of Section [sic] 25 through 34 of this article, to taxes imposed for any other purpose by any city, village, charter county, charter township, charter authority or other authority, the tax limitations of which are provided by charter or by general law.

In any school district which extends into two or more counties, property taxes at the highest rate available in the county which contains the greatest part of the area of the district may be imposed and collected for school purposes throughout the district.

There are two rules that guide our interpretation of art 9, § 6 and the rule of art 9, § 18 and art 7, § 26 as they apply to the LDFA. First, we note "that legislation is 'clothed with the presumption of constitutionality' and must be sustained if within constitutional limits." *W A Foote Memorial Hosp, Inc v Jackson Hosp Authority,* 390 Mich 193, 209; 211 NW2d 649 (1973). In *Oakland Co Taxpayers' League v Oakland Co Supervisors,* 355 Mich 305, 323; 94 NW2d 875 (1959), we noted that

this Court will not declare a statute unconstitutional unless it is plain that it violates some provisions of the Constitution and the constitutionality of the act will be supported by all possible presumptions not clearly inconsistent with the language and the subject matter.

Second, Const 1963, art 7, § 34 provides in part:

The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor.

The Constitutional Convention Comment regarding this provision indicates that it was

intended to direct the courts to give a liberal or broad construction to statutes and constitutional provisions concerning all local governments. [2 Official Record, Constitutional Convention 1961, p 3395.]

Thus, those arguing against the constitutionality of the LDFA must bear the burden of proof. They have failed to meet this burden as to art 9, § 6.

A

The Attorney General, arguing in opposition to the constitutionality of 1986 PA 281, advances an unusual argument. After summarizing art 9, § 6, the Attorney General states:

This provision for the levy of property taxes in inter-county school districts recognizes the uniformity clause of art 9, § 3, which requires that school taxes be uniform throughout the school district's territory.

The remainder of the Attorney General's first argument opposing the constitutionality of the LDFA focuses on the uniformity clause, art 9, § 3. Given that this is an advisory opinion rather than a case in controversy, we decline to expand our inquiry into the constitutionality of 1986 PA 281 beyond the two questions posed by the Governor, neither of which concerns the uniformity clause.

The various amici curiae arguing against the constitutionality of the tax increment financing provisions of 1986 PA 281 focus on the so-called *diversion* of tax revenues from the levying governmental units to the authority. This diversion is said to be violative of § 3 of the Property Tax Limitation Act, MCL 211.203; MSA 7.63, which, the amici curiae argue, implements Const 1963, art 9, § 6.

MCL 211.203; MSA 7.63 governs the method by which elections are to be held for the purpose of increasing the total tax rate limitation as provided in art 9, § 6. The statute provides, inter alia:

> Where a previous increase in the total tax limitation on property is about to expire and a new increase for the identical amount is proposed, the ballot proposal may be presented as a renewal or continuation of the previous increase for a specified number of years. *The ballot shall specify the intended purpose of the renewed or new funds. The ballot may also state the purpose for which the funds derived from the voted increase over the constitutional tax rate limitation may be used* . . . . [MCL 211.203(3); MSA 7.63(3).]

The amici curiae Michigan Association of School Boards, et al., and Michigan Education Association and amicus curiae Livingston County argue that once the voters have adopted an extra-voted millage proposition for school funding purposes, any diversion of that millage to a local development funding authority is violative of MCL 211.203(3); MSA 7.63(3), and hence of Const 1963, art 9, § 6. Amici curiae also observe that § 1216 of the School Code provides that

> money raised by tax shall not be used for a purpose other than that for which it was raised without the consent of a majority of the school electors . . . . [MCL 380.1216; MSA 15.41216.]

As a final argument, opponents of constitutionality maintain that, in addition to violating art 9, § 6, the LDFA amends by implication both the Property Tax Limitation Act and the School Code, in violation of art 4, § 25.[12]

---

[12] Const 1963, art 4, § 25, provides:

In response, the Attorney General, arguing in favor of constitutionality, focuses upon the language of art 9, § 6. He maintains that that provision limits *only* the *rate* of general ad valorem tax, not the amount or use of revenues generated by that tax:

> To find that Art 9, § 6, imposes a limit on the revenues which may be generated by application of the various millage limits contained in the provision, or their use, would be to read something into the provision which is not expressly provided.

The Attorney General also relies on the Legislature's inherent power to allocate tax revenues. See *Huron-Clinton Metropolitan Authority v Bds of Supervisors of Five Counties,* 300 Mich 1, 19; 1 NW2d 430 (1941).

The amici curiae in favor of constitutionality emphasize similar points. They maintain that there is no violation of art 9, § 6, because under tax increment financing no new or higher millage rates are levied. They argue that there is no "diversion" because the taxing units continue to receive the tax revenue they would have received had the authority not been created, and that those units are not required to give up any revenues to which they would otherwise be entitled. Finally, they cite the Legislature's exclusive power to allocate the use of taxes, which, they maintain, is what it did in enacting the LDFA.

**B**

As we have noted above, our inquiry into the

---

No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be re-enacted and published at length.

We decline to address this constitutional question because it is not within the scope of the Governor's request for an advisory opinion.

constitutionality of the LDFA is limited. The statute is vested with a presumption of constitutionality, and it is not our role to second-guess the Legislature regarding the wisdom of tax increment financing from a public policy perspective.[13]

We turn first to the words of the constitutional provision. The first sentence of Const 1963, art 9, § 6 states the general rule:

> [T]he total amount of general ad valorem taxes imposed upon real and tangible personal property for all purposes in any one year shall not exceed 15 mills on each dollar of the assessed valuation of property as finally equalized.

The next sentence of the provision describes the first exception to the general rule. In lieu of the fifteen-mill limitation,

> separate tax limitations for any county and for the townships and for school districts . . . may be adopted and thereafter altered by the vote of a majority of the qualified electors . . . .

These separate tax limitations must be adopted "[u]nder procedures provided by law," and the aggregate of the limitations "shall not exceed 18 mills . . . ."

The third sentence provides yet another excep-

[13] Tax increment financing as a matter of public policy has been both lauded and criticized. See, e.g., Mandelker, *Public entrepreneurship: A legal primer,* 15 Real Estate L J 3, 15 (1986); Davidson, *Tax-related development strategies for local government,* 13 Real Estate L J 121, 129 (1984); Reece & Coyle, *Urban redevelopment: Utilization of tax increment financing,* 19 Washburn L J 536, 540-543 (1980).

In a scathing dissent from the majority opinion in *Tribe v Salt Lake City Corp,* 540 P2d 499, 507 (Utah, 1975), Chief Justice Henriod equated Utah's tax increment financing legislation with "The Great Train Robbery." He also described the statute as "[t]he Commercial Encouragement Taxpayer Funded Complex." *Id.,* p 508. See also Justice Boyd's dissent in *State v Miami Beach Redevelopment,* 392 So 2d 875, 900 (Fla, 1981).

tion: The aggregate of the limitations may exceed eighteen mills "if approved by a majority of the electors . . . voting on the question." The voter-increased aggregate may not "exceed 50 mills on each dollar of valuation, for a period of not to exceed 20 years at any one time . . . ."

It is obvious that the tax increment financing provisions of the LDFA do not violate these provisions. By capturing tax revenues attributable to the increased value that is assumed to result from the development plan, tax increment financing has no effect on "the total amount of general ad valorem taxes imposed . . . ." The *amount* of taxes paid by taxpayers will be the same whether or not a tax increment plan is adopted by the authority.

The Attorney General arguing in opposition to constitutionality, and the amici curiae who oppose the constitutionality of the LDFA, would have us read into these provisions of art 9, § 6 a limitation on the *use* as well as on the amount of millage imposed. However, the first paragraph of art 9, § 6 does not govern the allocation of revenues once the fifteen-mill or voter-approved additional millage has been imposed. Therefore, we cannot accept the argument that tax increment financing violates art 9, § 6 by diverting taxes from the purposes for which they were levied or by diverting to the authority district revenues that were levied by local taxing units. We emphasize that the first paragraph of art 9, § 6 does not address the question of "purpose"; it places a limitation on the tax *rate,* not on tax revenues or their use.

The second paragraph of art 9, § 6, known as the nonapplication provision provides:

The foregoing limitations shall not apply to taxes imposed for the payment of principal and interest on bonds approved by the electors or other

evidences of indebtedness approved by the electors or for the payment of assessments or contract obligations in anticipation of which bonds are issued approved by the electors, which taxes may be imposed without limitation as to rate or amount; or, subject to the provisions of Section 25 through 34 of this article, to taxes imposed for any other purpose by any city, village, charter county, charter township, charter authority or other authority, the tax limitations of which are provided by charter or by general law.

This provision does speak of purpose or use in that it creates a millage limitation exception for taxes imposed for the payment of certain bonding and other evidences of indebtedness when that indebtedness was approved by a vote of the people. We do not, however, have to speak to the constitutionality of millage enacted pursuant to this provision inasmuch as 1986 PA 281 specifically exempts from captured tax increment "millage specifically levied for the payment of principal and interest of obligations approved by electors or obligations pledging the unlimited taxing power of the local governmental unit." MCL 125.2163(1); MSA 3.540(363)(1). Const 1963, art 9, § 13.

Therefore, as to millage enacted pursuant to the first paragraph of art 9, § 6, the Legislature retains the power to allocate tax revenues. As we stated in regard to the precursor of art 9, § 6 in Const 1908:

The constitutional amendment contains no provision for a division of the total one and one-half per cent taxes between the State, counties, cities, villages, townships, or school districts. Nor is there any statutory provision relative to such division or allocation. . . . Taxation is a legislative power vested by the Constitution in the legislative branch of the State government. *Determination of*

*the sources of tax revenue and the apportionment of taxation require legislative action.* 1 Cooley on Taxation (4th ed), §§ 64, 74; 2 Cooley on Taxation (4th ed), § 539. *As noted, this amendment to the Constitution contains no provision for allocation of taxes.* It is not self-executing. [*Pontiac School Dist v Pontiac,* 262 Mich 338, 353; 247 NW 474 (1933). Emphasis added.]

In *Huron-Clinton Metropolitan Authority, supra,* p 19, we again stressed the inherent power of the Legislature in areas left unaddressed by the constitution.

The advisability or wisdom of statutory enactments which are not violative of constitutional provisions is a matter for legislative consideration, but not for the courts.

This inherent power derives from the fact that constitutional provisions are to be regarded as limitations on the exercise of power, not a grant of power. *Oakland Co Taxpayers', supra,* p 323.

Other state courts have drawn similar conclusions:

[T]he law is well settled that in exercising the powers of the state the legislature may require the revenue of a municipality, raised by taxation, to be applied to uses other than that for which the taxes were levied. Its power is, of course, subject to constitutional limitations, but here we see no specific constitutional limitation which has been offended . . . . [*Tribe v Salt Lake City Corp,* 540 P2d 499, 504 (Utah, 1975).]

See *People ex rel City of Canton v Crouch,* 79 Ill 2d 356, 369-370; 403 NE2d 242 (1980). ("It is not the function of this court to assess the advisability of taxation schemes . . . .")

Some states found no diversion even in the face of a constitutional prohibition against changes in the purpose to which tax revenues are put. See *Kelson v Pensacola,* 483 So 2d 77, 78 (Fla App, 1986); *State v Daytona Beach,* 484 So 2d 1214, 1215 (Fla, 1986); *Meierhenry v City of Huron,* 354 NW2d 171, 181 (SD, 1984). These courts have found no diversion because "[t]he [tax increment financing] Act has no impact on taxes levied prior to the creation of a tax incremental district[,]" *id.,* p 181; because purposes in aid of an authority may also be considered "County purposes," *Kelson, supra,* p 79; and because it is assumed that any increase in tax revenues that derives from captured assessed value is directly attributable to the activities of the authority.

Other courts have recognized the underlying assumption of tax increment financing when rejecting the diversion argument. See *Sigma Tau Gamma Fraternity House Corp v City of Menomonie,* 93 Wis 2d 392, 414; 288 NW2d 85 (1980); *State v Daytona Beach, supra,* p 1215; *Salt Lake Co v Murray City Redevelopment,* 598 P2d 1339, 1342 (Utah, 1979). The Wisconsin Supreme Court observed that if the local development financing authority were

> unable to undertake such projects in the first place, the other taxing authorities would be completely without the additional revenue . . . . The increased tax revenue is due, after all, to the [authority]-sponsored project. In light of this fact it is difficult to see how the other local governmental entities are being forced to relinquish any revenue to which they would otherwise be entitled. [*Sigma Tau, supra,* p 414.]

See also *South Bend Public Transportation Corp v South Bend,* 428 NE2d 217, 224 (Ind, 1981); David-

son, *Tax increment financing as a tool for community redevelopment,* 56 U Det J Urb L 405, 411 (1979).

Regardless of the logic of these arguments, it is unnecessary to address any question of diversion under art 9, § 6. That provision leaves the Legislature free to alter the purposes to which tax revenues are put.

Courts finding tax increment financing legislation to be an unconstitutional diversion of tax revenues have based their conclusions on constitutional provisions that are far more specific than art 9, § 6.[14] For example, in *Miller v Covington Development Authority,* 539 SW2d 1, 5 (Ky, 1976), the Kentucky Supreme Court held the Kentucky Tax Increment Act unconstitutional as violative of § 184 of the Kentucky Constitution. The court noted that § 184 had

> always been construed as meaning that money collected for the purposes of education in the common school system cannot be spent for any other purpose, public or not.

Like the Supreme Court of Illinois, we decline to follow *Miller* because of "[t]he fact that our constitution provides for no such limitation on education revenues . . . ." *City of Canton v Crouch, supra,* p 368. The Attorney General and amici curiae would have us read certain requirements of the Property

[14] In *El Paso Co Community College Dist v El Paso,* 698 SW2d 248 (Tex App, 1985), rev'd 729 SW2d 296 (Tex, 1986), the Texas Court of Appeals considered the conflict between a state constitutional amendment that authorized tax increment financing and the constitutional provision dealing with public school financing. It held that "tax revenues belonging to . . . an independent school district cannot be pledged for the repayment of tax increment financing obligations." *Id.,* p 252. The Texas Supreme Court reversed, however, finding that the Legislature and the voters who adopted the amendment intended to include school districts as a political subdivision required to participate in tax increment financing.

Tax Limitation Act and the School Code into art 9, § 6. We decline to do so.

Thus, we find that the opponents of the constitutionality of 1986 PA 281 have failed to bear the burden of proving that the provisions of the LDFA regarding tax increment financing are, on their face, violative of art 9, § 6. The Legislature is not prohibited by art 9, § 6 from allowing the capture of tax revenues attributable to future increases in property values to be used for the purposes designated by the act.

III

The second question presented is: Do the capture of revenues, i.e., revenues derived from captured assessed value, by a local development authority and use of such revenues for purposes authorized by the act—i.e., for "public facilities," and as provided in § 14—unconstitutionally lend the credit of the state or a municipality in violation of Const 1963, art 9, § 18 or art 7, § 26? Again, in light of the presumption of constitutionality, and the burden of proof that operates in the municipalities' favor, we find that the challengers of the LDFA's constitutionality have failed to demonstrate that the capture and use of tax increment revenues as specified in the act violate the rule of art 9, § 18 and art 7, § 26.

Article 9, § 18 provides:

The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution.

This section shall not be construed to prohibit the investment of public funds until needed for current requirements or the investment of funds accumulated to provide retirement or pension ben-

efits for public officials and employees, as provided by law.

Article 7, § 26 provides:

> Except as otherwise provided in this constitution, no city or village shall have the power to loan its credit for any private purpose or, except as provided by law, for any public purpose.

## A

The Attorney General makes an abbreviated argument in opposition to the constitutionality of 1986 PA 281 in reliance upon these two provisions. He maintains that to the extent the LDFA permits the diversion of revenue from counties and school districts to finance "public facilities" that benefit property in a local development district, it lends the credit of the state in violation of art 9, § 18. He argues that the same alleged diversion also constitutes a violation of art 7, § 26.

The essence of this argument, however, is its unwillingness to

> accept the legislative finding that it is necessary "to legislate tax increment financing," to achieve the public purpose of creating jobs and promoting economic growth in the State.

The brief in opposition proposes other means for achieving the legislative goals of the LDFA.

The amici curiae who oppose the constitutionality of the act provide a more analytical approach to the problem. They maintain that the pledge of a portion of future property tax levies to repay the bonded indebtedness of an authority constitutes a lending of the state's credit, and that there is no

exception in the constitution that would authorize such an extension of credit. Therefore, they argue that § 14(1) of the LDFA, allowing tax increment bonds, is violative of art 9, § 18. It is the *state's* credit, according to the amici curiae, because the tax levying agency, i.e., the school district, is under the strict control of the state and is acting in furtherance of a state-mandated activity.

Other opponents of the constitutionality of the LDFA argue that, to the extent a city pledges its own increased property tax revenues within its own constitutional debt limitation, art 9, § 18 and art 7, § 26, are not violated. It is the fact that the indebtedness is repaid from revenues generated by millage applicable to both the city and the county that makes the act unconstitutional.

In favor of the constitutionality of the act, the Attorney General argues that the tax increment financing provisions of the act do not constitute a lending of the state's credit per se, in violation of art 9, § 18, or art 7, § 26 because the purpose of the act is a public one, and the tax increment revenues may only be used for public facilities. The Attorney General argues that tax increment bonds are not unconstitutional because captured tax increment revenues are a restricted, readily identifiable fund; a pledge of such limited restricted funds does not constitute a lending of the state's or the municipality's credit since there is no pledge of full faith and credit.

Amicus curiae Michigan Townships Association argues that even the granting of a municipality's full faith and credit to underwrite tax increment bonds should be upheld since tax increment financing serves a public purpose and is provided by law.

In addition to these arguments, amici curiae argue that the two constitutional provisions are not violated because, when tax increment revenues

are used according to the act, no property is being given away without consideration.

B

Article 9, § 18 states the general rule that the state shall not lend its credit except as provided in the constitution.

The purpose of this provision is to make certain that the State, which itself cannot borrow, except as authorized, does not accumulate unauthorized debts by indorsing or guaranteeing the obligations of others. [*Advisory Opinion re Constitutionality of 1966 PA 346,* 380 Mich 554, 564; 158 NW2d 416 (1968).]

The prohibition of art 9, § 18 applies to local governments as political subdivisions and instrumentalities of the state. *Oakland Co Drain Comm'r v Royal Oak,* 306 Mich 124, 142; 10 NW2d 435 (1943) (construing the predecessor to Const 1963, art 9, § 18: Const 1908, art 10, § 12).

As we observed in *Gaylord v Gaylord City Clerk,* 378 Mich 273, 292; 144 NW2d 460 (1966), art 7, § 26 is an exception to the general rule of art 9, § 18, governing the lending of credit by municipalities. In order to conform to the requirements of the art 7, § 26 exception, the loan of a municipality's credit must be both: (1) authorized by law, and (2) for a public purpose.

Thus, the threshold question is whether the capture and use of tax increment revenues authorized in the act constitute a loan of credit? If the act authorizes the lending of the state's credit, it is unconstitutional pursuant to art 9, § 18. If it is a loan of municipal credit, then the two requirements of art 7, § 26, must be considered. If not a

loan of credit at all, then there is no need to consider art 7, § 26.

There are, therefore, two ways in which the prohibition of art 9, § 18 might be found inapplicable altogether. If the capture and use of tax increment revenues as authorized in the act do not amount to a loan of credit at all, or if the use of such revenues does not amount to a loan of credit by the state or one of its municipalities, then there is no constitutional hurdle posed by art 9, § 18.

Section 14 of the LDFA is the provision that opponents find violative of art 9, § 18. Section 14(1) permits the authority to sell tax increment bonds,

pledg[ing] for debt service requirements the tax increment revenue to be received from an eligible property.

Section 14(2) allows the municipality, by majority vote of its governing body, to

make a limited tax pledge to support the authority's tax increment bonds or, if authorized by the voters of the municipality, pledge its full faith and credit for the payment of the principal of and interest on the authority's tax increment bonds. [MCL 125.2164; MSA 3.540(364).]

1

In determining whether tax increment bonds amount to a loan of credit at all, we turn to a rule articulated frequently in the decisions of this Court. In general, self-liquidating, special obligation, or revenue bonds are excluded from the constitutional definition of loan of credit. *Gaylord, supra,* p 294; *Alan v Wayne Co,* 388 Mich 210; 200

NW2d 628 (1972); *Advisory Opinion re Constitutionality of 1966 PA 346, supra,* p 565.

> If the . . . bonds are revenue bonds Const 1963, art 9, § 18 is not pertinent. This Court has several times held neither debt nor credit is involved in a true revenue bond situation. . . . Consequently the credit of the state or county—state includes its subdivision county . . .—is not involved in a true revenue bond situation. [*Alan, supra,* p 324.]

See *Advisory Opinion on Constitutionality of 1976 PA 295 & 297,* 401 Mich 686, 701; 259 NW2d 129 (1977).

We have noted the relevant distinction between revenue bonds and special obligation bonds, on the one hand, and general obligation bonds, on the other:

> Revenue bonds and special obligation bonds share an essential distinction from general obligation bonds. The credit of the State is pledged for the payment of general obligation bonds. It is not for revenue bonds and special obligation bonds. Special obligation bonds are retired from special tax revenues earmarked for that purpose. Revenue bonds are retired from the proceeds of the operation of the public structure or enterprise supporting their issuance. [*Schureman v State Hwy Comm,* 377 Mich 609, 611-612; 141 NW2d 62 (1966).]

The question, then, is whether tax increment bonds, as described in § 14 of the act, are more like general obligation bonds or revenue and special obligation bonds. Proponents of the act emphasize that tax increment revenues are a "restricted, readily-identifiable fund," whereas the opponents maintain that they are general obligation bonds, since the municipality may pledge its full faith and credit in support of them.

First, we observe that tax increment bonds are distinguishable from the bonds at issue in *1966 PA 346,* which were held to be self-liquidating revenue bonds. The revenue pledged for payment of the housing authority bonds in that case was money to be received for the repayment of loans made to housing associations. Likewise, in *State Hwy Comm'r v Detroit City Controller,* 331 Mich 337, 349; 49 NW2d 318 (1951), the bonds at issue were held to be "closely analogous" to revenue bonds in that the funds to be used to repay the bonds were vehicular taxes which were "earmarked exclusively for highway purposes . . . ."

Similarly, in *1976 PA 295, supra,* p 702, the notes and bonds in question were held to be special obligation bonds because their payment was

strictly limited to the proceeds of constitutionally restricted highway revenues placed by law in the General Transportation Fund, being derived from taxes on gasoline and other constitutionally restricted highway taxes . . . .

Tax increment bonds that are backed by a municipality's pledge of credit are not highly analogous to bonds that will be repaid with vehicular or gasoline taxes.

In *Advisory Opinion re Constitutionality of 1973 PA 1 & 2,* 390 Mich 166; 211 NW2d 28 (1973), we reviewed the history of the revenue bond exception in the context of "indebtedness" under art 9, § 12. The exception was not applied to the notes in question, which were payable from loan payments made by school districts. The funds pledged for their payment were

"any funds of the district legally available therefor," including a newly-levied income tax of not exceeding 1% or a newly-levied ad valorem tax of

not more than 2.25 mills . . . and as secondary security future "state aid moneys and any other funds of the district . . . ." [*Id.*, pp 175-176.]

We declined in *1973 PA 1 & 2* to further extend the so-called revenue bond exception.

> The plan proposed by the acts now before us does not comprehend repayment of the loan from revenue derived from the operation of a facility. These are not "revenue bonds."
>
> The plan does not provide for repayment of the loan from privilege taxes levied on users of the facility. These are not "special obligation" bonds.
>
> These loans will be repaid from general taxes, an income tax or an ad valorem tax or payments received from the school aid fund made up of constitutionally dedicated sales tax revenue and appropriations largely derived from general taxation. [*Id.*, p 177.]

We distinguished the notes at issue in *1973 PA 1 & 2* from highway bonds and from the notes of *1966 PA 346, supra:*

> The state notes here involved, in contrast with the notes of the State Housing Development Authority dealt with in [*1966 PA 346, supra*], are direct obligations of the state. It is not contemplated that they will be repaid with revenue but with taxes. The taxes are levied generally, not merely against users of facilities to be constructed with the proceeds of the bonds. The bonds in that case are more closely akin to revenue bonds or users' privilege tax bonds than the bonds in this case. [*Id.*, p 179.]

One commentator has observed:

> When compared to other public borrowing techniques, TIF is a hybrid between revenue bonds,

based on the expected returns from a given project, and special purpose bonds to meet a public objective such as industrial development or provision of low and moderate income housing. With revenue bonds, the public authority obtains financing for a major public improvement by pledging expected income from user charges to retirement of debts incurred in the construction process. It is used most often for projects such as toll bridges or water and electric utility improvements, where an existing demand for the particular service is shown. Although TIF is similar in that expected revenues generated by construction are pledged to bond retirement, redevelopment projects in blighted areas may not be as attractive to investors, particularly since public redevelopment presumes that the private market is unwilling to invest without additional incentives. *In this sense, TIF is not totally self-financing, since the government authority must provide additional guarantees in cases of non-payment or insufficient tax increments to service the outstanding debt.* [Davidson, *supra,* p 413. Emphasis added.]

We agree with this analysis, and it comports with the argument of at least one of the amici curiae. The Michigan Townships Association notes:

If tax increment financing is held to be constitutional by this Court, to make it of any immediate use to the LDFA's would require issuance of bonds, and the credit of the municipality may very well be needed in order to carry out the purpose, of 1986 PA 281.

Section 14 of the LDFA permits municipalities to make a "limited tax pledge to support the authority's tax increment bonds or, if authorized by the voters of the municipality, pledge its full faith and credit . . . ." MCL 125.2164(2); MSA 3.540(364)(2). Therefore, the exception to art 9, § 18, which

allows revenue and like bonds to be considered something other than a loan of credit, should not be extended to include tax increment bonds.

The courts of other jurisdictions have come to similar conclusions in response to the question whether tax increment bonds constitute indebtedness within the meaning of their constitutions. Although some courts concluded otherwise, see, e.g., *South Bend Public Transportation Corp, supra; Wolper v Charleston City Council,* 287 SC 209, 213-214; 336 SE2d 891 (1985); *Denver Urban Renewal Authority v Byrne,* 618 P2d 1374 (Colo, 1980), we prefer the reasoning of those courts that found no application of the "revenue bond" exception to the constitutional debt question.

The Iowa Supreme Court, in *Richards v City of Muscatine,* 237 NW2d 48, 64 (SD, 1984), observed:

> The taxes which will be used to pay the proposed urban renewal bonds and interest will be general taxes. This is not a case of a special assessment tax which was never intended to be used, and could not be used, to meet other expenses of the city. Nor is this a case where the bonds are to be paid from the operating revenues of a municipal enterprise which generates income, such as a power plant.
>
> *Ultimately the "credit" of a city is its power to levy general taxes. When it pledges all or part of that power, it pledges its credit* and in a realistic sense incurs an obligation. [Emphasis added.]

Accord *Meierhenry, supra,* pp 178-179; *Tucson v Corbin,* 128 Ariz 83, 87-88; 623 P2d 1239 (1980).

The courts that found no general obligation, and therefore no constitutional impediment, focused on the specific bonds in question and concluded that they were "not secured by the full faith, credit and taxing power of the municipality, and therefore

cannot be classified as a general obligation debt."
*Wolper, supra,* p 215. The Supreme Court of Indiana stated simply: "If the value of property does not increase, the bonds will not be repaid." *South Bend Transportation Corp, supra,* p 221.

Given the nature of the case at bar, we cannot draw similar conclusions. The LDFA permits the municipality to make a limited tax pledge. We must assume that some municipalities will take advantage of this opportunity to back up the bonds of the authority. Indeed, at least one amicus curiae has indicated that such support is necessary to the success of tax increment bonds. Therefore, in contrast to these courts, we find that tax increment bonds, as envisioned in the LDFA, do bring into play the general taxing authority of the sponsoring municipality, and do not fit within the revenue bond exception to the definition of a loan of credit. Our conclusion does not foreclose the possibility that tax increment bonds may at some time in the future be issued as revenue bonds if the municipality is not responsible in any way for repayment of the bonds.

There is another means by which tax increment bonds might be found outside the definition of a loan of credit, as contemplated in art 9, § 18. If the state or a municipality receives value in return for what it gives away, there is no loan of credit under the constitution. We articulated this rule in *Alan, supra,* p 325:

> Michigan case law interpreting Const 1963, art 9, § 18 is neither ample nor precise. It is clear the state or its subdivision the county cannot give anything away without consideration. [Citations omitted.] Note that the constitution as far as the state and county are concerned makes no difference between a public and a private purpose in this regard. When the state acquires or transfers

something of value in return for value the state does not offend Const 1963, art 9, § 18.

Normally, "the Legislature or Executive Branch is the judge of what is fair value in matters in which it is concerned . . . . Their judgment, however, is subject to judicial review for abuse of judgment." *Id.,* p 330.

The proponents of constitutionality argue that a municipality gives nothing away by using tax increment financing because the financing is used only for the construction of "public facilit[ies]," see MCL 125.2152(k); MSA 3.540(352)(k), to which the municipality retains title. They note that such "public facilit[ies]" inure to the public's benefit.

We cannot accept this argument. In our view, the public facilities that are provided by the authority through the mechanism of tax increment financing are, at least in part, facilities that would otherwise be paid for by the levy of a special assessment on the affected property. The municipality, through its authority, is essentially giving away something of value in the hope that general economic growth will result within the district. We are hard pressed to characterize this arrangement as "value for value."

In sum, because tax increment bonds fit neither within the revenue bond exception of art 9, § 18, nor the value rule of *Alan,* we hold that, as envisioned in the LDFA, such bonds do constitute a loan of credit to which the proscription of art 9, § 18 applies.

The next question under art 9, § 18 is whether the bonds in question amount to a loan of the *state's* credit. If it is the state's credit that is involved, then the exception of art 7, § 26 does not apply. Some of the opponents of the LDFA maintain that the pledging of future tax levies under the act

amounts to an extension of the school district's credit and that, therefore, because the district is an agency of the state, it amounts to a loan of the state's credit.

We do not agree. We find that in the case of tax increment bonds under the LDFA it is the credit of the municipality that created the local development authority, and not the state, which is at stake. Therefore, art 7, § 26 applies. As in *1966 PA 346, supra,* p 567, the LDFA "does not obligate the State of Michigan . . . to repay moneys borrowed . . . ." However, the act does appear, at least in theory, to obligate the sponsoring municipality to repay the bonds.

Some state courts have concluded that the tax increment financing schemes at issue did not amount to a pledge of credit by the municipality, but only by the authority. See, e.g., *Denver Urban Renewal, supra,* p 1383. The Colorado Supreme Court found:

> Denver is not indebted as a result of the tax-allocation financing scheme. The obligation incurred is solely [the authority's]. The [authority's] resolution authorizing the bonds clearly provides that only [the authority] is obligated to repay the bonded indebtedness, and the financing scheme bears this out.

Considering the entire statutory scheme of the LDFA, and § 14 in particular, it is apparent that some pledge of credit by the municipality is envisioned. The local development financing authority is wholly a creature of the municipality; the governing body of the municipality must approve of all development and tax increment financing plans; MCL 125.2162(2), (5); MSA 3.540(362)(2), (5) and MCL 125.2166; MSA 3.540(366); the municipal-

ity's governing body dissolves the authority; and the municipality retains all property and assets of the authority after the satisfaction of its obligations. MCL 125.2170; MSA 3.540(370).

Thus, we conclude that the capture of tax increment revenues and use of those revenues, i.e., as a pledge for tax increment bonds, do constitute a loan of credit under art 9, § 18, but do not amount to a violation of that provision in that the State of Michigan is not obligated in any way. Rather, the permissible uses of tax increment revenues may amount to an extension of the municipality's credit, and must therefore satisfy the requirements of art 7, § 26. Under that provision, a municipality's loan of credit must be (1) provided by law, and (2) for a public purpose.

2

As in *Sinas v City of Lansing,* 382 Mich 407, 412; 170 NW2d 23 (1969), "the legislature has provided ample statutory authority to remove the [loan of credit] . . . from the constitutional disability." Obviously, the LDFA, through § 14, authorizes municipalities to pledge their credit, in the form of anticipated future tax revenues, in support of tax increment bonds. This is sufficient to overcome the first constitutional hurdle under art 7, § 26.

The second hurdle is not so easily cleared, as the question of public purpose has plagued tax increment financing schemes since their inception. However, in Michigan we have recognized a liberal version of the public purpose doctrine.

Expressing the doctrine generally in *Gaylord, supra,* we stated that the theme of public purpose running through the constitutional and the public policy of this state limits the powers of the Legisla-

ture and of government generally to acts that exhibit a public purpose. We observed:

> " 'The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. . . . *It reaches perhaps its broadest extent under the view that the economic welfare is one of the main concerns of the city, State, and the Federal governments.'* " [*Id.*, p 298 (quoting *Harrison v Claybrook*, 372 P2d 602, 605 [Okla, 1962]). Emphasis added.]

Relevant to this observation, the legislative findings section of the LDFA states that the purpose of the act is "to eliminate the causes of unemployment, underemployment, and joblessness therefore benefiting the economic growth of the state." MCL 125.2151(1)(b); MSA 3.540(351)(1)(b). The Legislature found "[t]hat the creation of jobs and the promotion of economic growth in the state are essential governmental functions and constitute essential public purposes." MCL 125.2151(1)(f); MSA 3.540(351)(1)(f). Although the LDFA indirectly benefits private interests and to some extent goes beyond the rather limited public purposes that have been recognized as sufficient in other tax increment financing cases, under the broad public purpose doctrine recognized in Michigan, we find that the LDFA satisfies this constitutional criterion.

Like the courts of other states, we decline to second-guess the wisdom of the Legislature in the area of public purpose determinations. See *Wolper, supra,* p 216; *R E Short Co v Minneapolis,* 269 NW2d 331, 337 (Minn, 1978) (court will "pay great deference to the initial legislative determination that a particular project serves a public purpose"). In *State v Daytona Beach, supra,* p 1216, the Supreme Court of Florida found

that it is within the legislature's power to make community redevelopment one of the "respective purposes" of special taxing districts and to broaden the purpose of a special taxing district if it determines there is a need to do so.

In *1976 PA 295, supra,* p 696, we noted

that this Court has recognized that the determination of what constitutes a public purpose is primarily the responsibility of the Legislature, and that the concept of public purpose has been construed quite broadly in Michigan. *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465, 495-498; 242 NW2d 3 (1976). For example, this Court has found that promoting the sale of Michigan apples, the payment of dues by a city for a membership in the Michigan Municipal League, the construction of a port marina by a city, the issuance of bonds by a city to finance the construction of privately owned industrial buildings, [*Gaylord, supra,*] the construction of a sports arena, public financing of gubernatorial elections and the creation of a state authority authorized to make loans directly to, or guarantee loans made to, private business enterprises for financing job development projects may all serve a valid public purpose.

The stated purpose of the LDFA appears to fall within this range of recognized public purposes. In addition, it conforms to the more general definition of public purpose described in *Gaylord, supra,* p 300:

" '[A] public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose.' " [Quoting 37 Am Jur, Municipal Corporations, § 120, p 734.]

The finding of a public purpose is generally unaffected by the fact that private interests may benefit from implementation of the statutory scheme. See *Sinas, supra,* p 412; *1966 PA 346, supra,* p 585. This is true in other jurisdictions as well. See, e.g., *Crouch, supra,* p 369; *Richards, supra,* p 60; *Wolper, supra,* p 216; *Denver Urban Renewal Authority, supra,* p 1384.

Opponents of the LDFA are troubled by the fact that the act does not require the municipality to make a finding of urban blight or deterioration before creating a local development financing authority or implementing other provisions of the act. It is true that a majority of the tax increment financing cases from other jurisdictions have rested findings of sufficient public purpose on the fact that the legislation in question required the municipality to make a finding of "urban blight" before implementing a tax increment financing program. See Newman, *Tax increment financing for development and redevelopment,* 61 Or L R 123, 141 (1982); Huddleston, *A comparison of state tax increment financing laws,* 55 State Gov't 29, 31 (1982). We have also recognized the elimination of urban blight as a legitimate public purpose, see, e.g., *Sinas, supra,* p 412. However, in light of the broad public purpose doctrine recognized in this state, we decline to limit the doctrine, as it applies to tax increment financing, to the elimination of urban blight.

Thus, in response to the second question presented, we find that the capture and use of tax revenues, as authorized in § 14 of the LDFA, amount to a loan of credit under art 9, § 18. However, the loan of municipal credit permitted under the act is constitutional pursuant to art 7, § 26, in that it is authorized by law and furthers a public purpose.

In sum, we answer both of the questions presented in the negative. Neither Const 1963, art 9, § 6 nor the rule of Const 1963, art 9, § 18 and Const 1963, art 7, § 26, are violated by the capture and use of tax increment revenues as authorized in 1986 PA 281. We express no opinion on the potential applications of other constitutional provisions or on possible violations of the act itself. It goes without saying that future cases in controversy that arise from application of the act to particular sets of facts may present questions left unaddressed by this opinion.

CAVANAGH, BOYLE, ARCHER, and GRIFFIN, JJ., concurred with BRICKLEY, J.

LEVIN, J. (*dissenting in part*). We agree with the majority that the capture of ad valorem tax revenues by a local development finance authority and use of such revenues by the authority for purposes authorized by the Local Development Financing Act do not unconstitutionally lend the credit of the state or of a municipality in violation of Const 1963, art 9, § 18 or art 7, § 26.

We also agree with the majority that the act does not unconstitutionally divert ad valorem tax revenues from taxing entities in violation of Const 1963, art 9, § 6,[1] insofar as the generation of the revenues is not dependent on millage authorized by a vote of the electors. We disagree insofar as ad valorem tax revenues generated as a result of a vote of the people are so diverted. Ad valorem tax revenues generated as a result of tax limitations adopted or increased by the vote of the electors may not be so diverted and may only be used for the purposes of the school district or other district

[1] See *ante,* p 105.

or authority, the electors of which authorized the additional millage that generated the revenue.

Art 9, § 6, provides that the total amount of the general ad valorem taxes imposed upon real and tangible personal property shall not exceed fifteen mills on each dollar of the assessed valuation of property. It provides further that separate tax limitations for any county and for the townships, and school districts therein, not exceeding eighteen mills on each dollar, may be adopted and thereafter altered by a majority of the qualified electors of the county in lieu of the fifteen-mill limitation. It is still further provided that these limitations may be increased to an aggregate not to exceed fifty mills if approved by a majority of the electors.

We recognize that the constitution does not expressly require, when voters have approved a millage increase from fifteen to eighteen mills and have established separate township, school district, and county tax limitations, that the ad valorem tax revenues generated by these specific separate limitations be allocated to the particular township, school district or the county for which established. Such a requirement is, however, in our opinion, implicit in the constitution. The Legislature may not constitutionally divert ad valorem tax revenues generated by the separate tax limitations adopted for, say, school districts to township or county purposes or possibly even to state purposes.

Nor do we agree with the majority's conclusion that the constitution does not require that ad valorem tax revenues generated by increased millage voted by the electors of a school district be used for school purposes. The majority states that "the first paragraph of art 9, § 6 does not address the question of 'purpose'; it places a limitation on

the tax *rate,* not on tax revenues or their use."[2] (Emphasis in original.) According to the majority, when school district electors authorize the levy of additional millage they have simply authorized an increase in the ad valorem tax that may be levied upon their real and tangible personal property; the constitution does not imply that the ad valorem tax revenues generated as a result of such a voter-authorized increase in the tax rate shall be used solely for school purposes. The Legislature might, under the majority's reading of the constitution, constitutionally divert ad valorem tax revenues generated by school district voted millage to other local uses and purposes or possibly even to state-wide uses or purposes.

A statute does indeed provide that ad valorem tax revenues generated by millage authorized by the vote of school district electors shall be used solely for school purposes.[3] Many statutes restate constitutional requirements. The enactment of a statute restating a constitutional requirement does not imply that absent the statute the constitution does not require what the statute states. Otherwise, the Legislature could repeal a constitutional requirement by enacting and then repealing a statute enunciating that constitutional requirement.

The majority does not reach the question whether the statutory provision takes precedence over the provision of the Local Development Financing Act that it is claimed permits the diversion to purposes authorized by the Local Development Financing Act of ad valorem tax revenues generated by a voter-authorized increase in the millage leviable against property located in a school district. We agree with the majority that we

---

[2] *Ante,* p 111.
[3] MCL 380.1216; MSA 15.41216.

may not properly reach that question, both be-
cause it is not presented by the request for an
advisory opinion and because an advisory opinion
can only be given on constitutional questions[4] and
not on a question of statutory construction.

The justices have not heretofore agreed to give
an advisory opinion on the constitutionality of the
Local Development Financing Act; we expressly
left open until after oral argument, and only
today, by issuing our opinions, have we decided
whether to do so.[5] The justices could justifiably,
and, we believe, should decline to answer whether
revenues generated by millage approved by the
voters of a school district may be used for non-
school purposes. This aspect of the request need
not be decided until after the Court decides, when
presented,[6] the statutory construction question
whether one legislative enactment or the other
takes precedence. It is well established that a
constitutional question will not be reached if the
matter can appropriately be decided on some other
basis.[7]

The majority distinguishes the first paragraph of
art 9, § 6 from the second paragraph of art 9, § 6,
which provides that the "foregoing [fifteen-mill]
limitation[ ] shall not apply to taxes imposed for
the payment of principal and interest on bonds
approved by the electors . . . which taxes may be

---

[4] Const 1963, art 3, § 8. See *ante*, p 97.

[5] *Ante*, p 98.

[6] It appears that there may be some urgency in obtaining a defini-
tive ruling from this Court. The parties so concerned could commence
an action for a declaratory judgment in a circuit court respecting the
statutory construction question. We could urge that if they do so the
circuit judge give the cause a high priority and promptly decide the
question. After decision by the circuit court, we could grant leave to
appeal prior to decision by the Court of Appeals and resolve this
remaining aspect of the request for an advisory opinion.

[7] *Lisee v Secretary of State*, 388 Mich 32, 40; 199 NW2d 188 (1972);
*Cole v Battle Creek*, 298 Mich 98, 104; 298 NW 466 (1941).

imposed without limitation as to rate or amount."[8] The majority finds that the second paragraph "does speak of [the] purpose or use" to which ad valorem tax revenues generated by millage approved by the electors pursuant to the second paragraph may be put[9] and does not simply place a limitation on the tax rate.

The majority has not stated an adequate reason for concluding that the second paragraph speaks of the purpose or use to which ad valorem tax revenues generated pursuant to that paragraph may be put, but that the first paragraph does not. The first paragraph provides that separate tax limitations may be "adopted and thereafter altered," and that such limitations may be "increased" "by the vote" of or if "approved" by the electors. The second paragraph provides that such limitations "shall not apply" when the additional tax imposition is "approved" by the electors. Those are, however, just different ways of saying the same thing.

The policy arguments and rationalizations advanced in support of the diversion of ad valorem tax revenues generated by millage voted pursuant to the first paragraph of art 9, § 6, apply with equal force to revenues generated by millage voted for the payment of bonds or other evidence of indebtedness pursuant to the second paragraph of art 9, § 6.

We would advise that the Local Development Financing Act does not unconstitutionally divert ad valorem tax revenues insofar as the revenues diverted are not generated as the result of tax limitations adopted or increased by the electors. We would, however, advise that revenues generated as the result of a tax limitation adopted or

---

[8] Const 1963, art 9, § 6.

[9] *Ante,* p 112.

increased by the electors may not constitutionally be so diverted.

RILEY, C.J., concurred with LEVIN, J.