**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JUNE 28, 2006

MICHIGAN CHIROPRACTIC COUNCIL and
MICHIGAN CHIROPRACTIC SOCIETY,

    Petitioners-Appellees,

v                                    No. 126530-1

COMMISSIONER OF THE OFFICE OF
FINANCIAL AND INSURANCE SERVICES,

    Respondent,

and

FARMERS INSURANCE EXCHANGE and
MID-CENTURY INSURANCE COMPANY

    Intervenors-Respondents-Appellants.
_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

Petitioners, two organizations representing the interests of Michigan chiropractors, challenged the validity of the "Preferred Provider Option" offered by appellants to their policyholders. In count I of their petition, petitioners claimed that the option violated the rights of the appellants' insureds. In count II of their petition, petitioners claimed a violation of the rights of chiropractic providers.

Regarding count I, we hold that petitioners do not satisfy the test for third-party standing, and may not litigate the claims of appellants' insureds. Regarding count II, assuming arguendo that petitioners have standing to sue on behalf of their membership, petitioners have not established an actual or imminent injury. Thus, petitioners' claim is not ripe for judicial review. Therefore, we vacate the judgments of the circuit court and the Court of Appeals and reinstate the decision of the Commissioner of the Office of Financial and Insurance Services (the Commissioner).[1]

## I. Facts and Procedural History

The appellant-insurers offer a "Preferred Provider Option" (PPO) to their no-fault automobile insurance policyholders, allowing their insureds to elect to limit their choice of medical care providers in the event they require personal injury protection (PIP) benefits. In exchange for reduced PIP premiums, insureds agree to receive treatment from a network of medical care providers maintained by Preferred Providers of Michigan (PPOM). In the event that a policyholder seeks treatment from a provider outside the PPOM network, the insured must pay a deductible, and provider reimbursement is limited to PPOM's customary reimbursement rate. The "Preferred Provider Option" is entirely voluntary; if policyholders do not opt for the endorsement, they do not receive the premium discount and are not limited to the PPOM network of providers.

---

[1] Because we dispose of this case on the basis of standing and ripeness, we do not address the substantive merits of appellants' appeal.

2

Appellants began offering the discounted policy option in July 2000.[2] In August 2000, petitioners filed a request with the Commissioner for a contested case hearing pursuant to MCL 500.2028 and MCL 500.2029, claiming that the PPO endorsement violated the Insurance Code, MCL 500.100 *et seq.* Petitioners asked the Commissioner to withdraw approval of the endorsement pursuant to MCL 500.2236(5) and to issue a cease and desist order to respondents.[3]

The Commissioner sought additional information from respondents and petitioners, which petitioners refused to supply. On the basis of the record established, the Commissioner rejected petitioners' request for a contested case hearing. The Commissioner concluded that the endorsement did not violate the no-fault act, MCL 500.3101 *et seq.* Petitioners appealed to the circuit court, which

---

[2] The policy option was deemed approved after the Commissioner failed to act within 30 days after the endorsement was submitted for approval pursuant to MCL 500.2236(1).

[3] Petitioners' amended petition contained four counts; however, only the two counts referenced above are relevant to this appeal. As noted, count I alleged that the endorsement violated the rights of insureds and count II alleged that the endorsement violated the rights of chiropractic providers. Count III alleged that the $500 deductible imposed when a policyholder sought treatment from a nonnetwork provider was a penalty, which "potentially imposes a tremendous hardship on insureds." However, following an adverse decision by the Commissioner, petitioners did not seek review of count III in the circuit court. Count IV challenged appellants' refusal to pay for chiropractic care in favor of allegedly comparable care provided by osteopathic physicians. This issue, which was not addressed by the Commissioner, was resolved in petitioners' favor in *Sprague v Farmers Ins Exch*, 251 Mich App 260; 650 NW2d 374 (2002), lv den 469 Mich 914 (2003).

3

reversed the decision of the Commissioner and held that the "Preferred Provider Option" was not authorized by law.

The Court of Appeals affirmed the circuit court judgment, holding that respondents' PPO endorsement was inconsistent with the no-fault act and that the authority to issue the endorsement must emanate from the Legislature.[4]

We granted leave to appeal, directing the parties to address among the issues briefed whether petitioners had standing to challenge the Preferred Provider Option on behalf of appellants' insureds and chiropractic providers.[5]

## II. Standard of Review

Whether a party has standing is a question of law that we review de novo.[6] Moreover, questions of justiciability implicate constitutional separation of powers principles.[7] Constitutional questions are likewise reviewed de novo.[8]

---

[4] 262 Mich App 228; 685 NW2d 428 (2004).

[5] 472 Mich 899 (2005).

[6] *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004); *Crawford v Dep't of Civil Service*, 466 Mich 250; 645 NW2d 6 (2002); *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001).

[7] *Nat'l Wildlife*, *supra*; *Lee*, *supra*.

[8] *Wayne Co v Hathcock*, 471 Mich 445; 684 NW2d 765 (2004).

III. Analysis

a. Justiciability

Our tripartite system of government is constitutionally established in both our state and federal constitutions. US Const, art III, § 1 confers upon the courts only "judicial power"; US Const, art III, § 2 limits the judicial power to "[c]ases" and "[c]ontroversies." Similarly, our state constitution, Const 1963, art 3, § 2, provides:

> The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

The powers of each branch are outlined in the Michigan Constitution, which assigns to the Legislature the task of exercising the "legislative power,"[9] the Governor the task of exercising the "executive power,"[10] and the judiciary the task of exercising the "judicial power."[11]

In *Nat'l Wildlife*, this Court described and defined the Court's constitutionally assigned "judicial power":

> The "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute, or

---

[9] Const 1963, art 4, § 1.

[10] Const 1963, art 5, § 1.

[11] Const 1963, art 6, § 1. As this Court noted in *Anway v Grand Rapids R Co*, 211 Mich 592, 598; 179 NW 350 (1920), "By the Constitution the judicial power was vested in the courts and it was vested in no other department of the government. To the courts was committed the judicial power *and no other*." (Emphasis added.)

case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making. [471 Mich 614-615.]

In seeking to make certain that the judiciary does not usurp the power of coordinate branches of government, and exercises only "judicial power," both this Court and the federal courts have developed justiciability doctrines to ensure that cases before the courts are appropriate for judicial action.[12] These include the doctrines of standing,[13] ripeness,[14] and mootness.[15]

---

[12] Justiciability doctrines such as standing, """mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.""" *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 196; 631 NW2d 733 (2001), quoting *Allen v Wright*, 468 US 737, 750; 104 S Ct 3315; 82 L Ed 2d 556 (1984), quoting *Vander Jagt v O'Neill*, 226 US App DC 14, 26-27; 699 F2d 1166 (1983) (Bork, J., concurring).

[13] The doctrine of standing requires "the existence of a party's interest in the outcome of litigation that will ensure sincere and vigorous advocacy." *House Speaker v State Admin Bd,* 441 Mich 547, 554; 495 NW2d 539 (1993). In order to establish standing, a plaintiff must establish three elements: (1) that the plaintiff has suffered a concrete """injury in fact"""; (2) the existence of a causal connection between the injury and conduct complained of that is """fairly . . . trace[able] to the challenged action of the defendant"""; and (3) that the injury will likely be """redressed by a favorable decision.""" *Lee, supra* at 739, quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992) (citations omitted).

(continued…)

Federal courts have held that doctrines such as standing and mootness are constitutionally derived and jurisdictional in nature, because failure to satisfy their elements implicates the court's constitutional authority to exercise only "judicial power" and adjudicate only actual cases or controversies.[16] Because these doctrines are jurisdictional in nature, they may be raised at any time and may not be waived by the parties.[17]

---

(…continued)

[14] Ripeness prevents the adjudication of hypothetical or contingent claims before an actual injury has been sustained. A claim is not ripe if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas v Union Carbide Agricultural Products Co*, 473 US 568, 580-581; 105 S Ct 3325; 87 L Ed 2d 409 (1985) (citation omitted). See also *Dep't of Social Services v Emmanuel Baptist Preschool*, 434 Mich 380; 455 NW2d 1 (1990).

[15] Mootness precludes the adjudication of a claim where the actual controversy no longer exists, such as where "'the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Los Angeles Co v Davis*, 440 US 625, 631; 99 S Ct 1379; 59 L Ed 2d 642 (1979), quoting *Powell v McCormack*, 395 US 486, 496; 89 S Ct 1944; 23 L Ed 2d 491 (1969). See also *Wedin v Atherholt*, 298 Mich 142; 298 NW 483 (1941).

[16] *Lewis v Casey*, 518 US 343, 349 n 1; 116 S Ct 2174; 135 L Ed 2d 606 (1996)("standing . . . is jurisdictional and not subject to waiver"); *Iron Arrow Honor Society v Heckler*, 464 US 67,70; 104 S Ct 373; 78 L Ed 2d 58 (1983) (courts "lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies"); *Reno v Catholic Social Services, Inc,* 509 US 43, 58 n 18; 113 S Ct 2485; 125 L Ed 2d 38 (1993)(noting that ripeness doctrine is drawn from constitutional limitations on judicial power as well as prudential considerations).

[17] *Reno*, *supra* (noting that ripeness question may be raised on the Court's own motion, and that the Court cannot be bound by the parties); *Lewis*, *supra* (standing not subject to waiver); *Nat'l Org for Women, Inc v Scheidler*, 510 US 249, 255; 114 S Ct 798; 127 L Ed 2d 99 (1994) (standing "remains open to review at all

(continued…)

Likewise, our case law has also viewed the doctrines of justiciability as affecting "judicial power," the absence of which renders the judiciary constitutionally powerless to adjudicate the claim.[18] This is a point made in *Anway v Grand Rapids R Co*:[19]

> "The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. When, in determining such rights, it becomes necessary to give an opinion upon a question of law, that opinion may have weight as a precedent for future decisions. But the court is not empowered to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it. No stipulation of parties or counsel, whether in the case before the court or in any other case,

---

(…continued)
stages of the litigation"); *Calderon v Moore*, 518 US 149, 150; 116 S Ct 2066; 135 L Ed 2d 453 (1996) ("mootness can arise at any stage of litigation").

[18] In contrast, an administrative agency does not possess "judicial power"; rather, the authority of the administrative agency is derived from the statute that created it. *Holloway v Ideal Seating Co*, 313 Mich 267; 21 NW2d 125 (1946). While administrative agencies "often act in a quasi-judicial capacity, it is recognized that they are established to perform essentially executive functions." *Judges of 74th Judicial Dist v Bay Co*, 385 Mich 710, 727; 190 NW2d 219 (1971). As an administrative agency does not possess and may not exercise "judicial power," neither is it bound by the limitations of "judicial power." In other words, administrative agencies are not bound by the same justiciability limitations that affect the authority of the judiciary. See *North Carolina Utilities Comm v Fed Communications Comm,* 537 F2d 787 (CA 4, 1976); *Tennessee Gas Pipeline Co v Fed Power Comm*, 197 US App DC 1; 606 F2d 1373 (1979); *Climax Molybdenum Co v Secretary of Labor*, 703 F2d 447 (CA 10, 1983); *Fed Communications Comm v Pacifica Foundation*, 438 US 726, 735; 98 S Ct 3026; 57 L Ed 2d 1073 (1978).

[19] 211 Mich 592, 615; 179 NW 350 (1920).

can enlarge the power, or affect the duty, of the court in this regard." [Citation omitted.]

Similarly, in *Novi v Robert Adell Children's Funded Trust*,[20] this Court recently stated:

> Where the facts of a case make clear that a litigated issue has become moot, a court is, of course, bound to take note of such fact and dismiss the suit, even if the parties do not present the issue of mootness. """Courts are bound to take notice of the limits of their authority, and a court may, and should, on its own motion, though the question is not raised by the pleadings or by counsel, recognize its lack of jurisdiction and act accordingly by staying proceedings, dismissing the action, or otherwise disposing thereof, at any stage of the proceeding."" Because "'[t]he judicial power . . . is the right to determine actual controversies arising between adverse litigants,'" a court hearing a case in which mootness has become apparent would lack the power to hear the suit. [Citations omitted.][21]

Because "the most critical element" of the "judicial power" requires that a case contain a genuine controversy between the parties,[22] we must ensure that one exists before exercising our judicial authority. The judiciary arrogates to itself the powers of the executive and legislative branches whenever it acts outside the constitutional confines of "judicial power." Fidelity to our constitutional structure compels this Court to be "vigilant in preventing the judiciary from usurping the

---

[20] 473 Mich 242, 255 n 12; 701 NW2d 144 (2005).

[21] See also Justice Weaver's lead opinion in *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633 n 3; 537 NW2d 436 (1995), where she noted that "[s]tanding is a jurisdictional issue that concerns the power of a court to hear and decide a case and does not concern the ultimate merits of the underlying substantive issues of the action."

[22] *Nat'l Wildlife*, *supra* at 615.

powers of the political branches."[23] Thus, we reiterate that questions of justiciability concern the judiciary's *constitutional jurisdiction* to adjudicate cases containing a genuine controversy.[24] Questions of justiciability may be raised at any stage in the proceedings, even sua sponte, and may not be waived by the parties.[25] Where a lower court has erroneously exercised its judicial power, an appellate court has "jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit."[26]

---

[23] *Lee*, *supra* at 737.

[24] This notion of "constitutional jurisdiction" is conceptually distinct from "subject-matter jurisdiction." The term "jurisdiction" is broadly defined as "the authority which the court has to hear and determine a case." *Ward v Hunter Machinery Co*, 263 Mich 445, 449; 248 NW 864 (1933). Subject-matter jurisdiction is a court's authority to try a case of a certain kind or character. See *Bowie v Arder*, 441 Mich 23, 39; 490 NW2d 568 (1992). Our authority to hear only cases containing a genuine controversy does not depend on the subject matter of the case; rather, it flows from the structural boundaries delineated in our constitution. See also *Travelers Ins v Detroit Edison*, *supra* (discussing distinctions between primary jurisdiction and subject-matter jurisdiction).

[25] We note that some recent Court of Appeals cases have erroneously equated standing with capacity to sue for the purposes of dispositive motions under MCR 2.116(C)(5). See, for example, *Rogan v Morton*, 167 Mich App 483; 423 NW2d 237 (1988); *Afshar v Zamarron*, 209 Mich App 86; 530 NW2d 490 (1995). However, as this Court previously noted in *Leite v Dow Chemical Co*, 439 Mich 920 (1992), the two concepts are unrelated. Our courts are admonished to avoid conflating the two.

[26] *United States v Corrick*, 298 US 435, 440; 56 S Ct 829; 80 L Ed 1263 (1936).

b. Third-party Standing

In count I of their amended petition, petitioners challenge appellants' policy endorsement as violating the rights of appellants' insureds. Thus, count I of the petition concerns third-party standing—whether petitioners may litigate to vindicate the rights of others.

The general rule is that a litigant cannot vindicate the rights of a third party.[27] The rule disfavoring *jus tertii*—litigating the rights of a third party— "assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation."[28] Furthermore, this rule reflects a "healthy concern" that if the claim is brought by a third party, "the courts might be 'called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.'"[29]

---

[27] See *People v Smith*, 420 Mich 1; 360 NW2d 841 (1984); *Ver Hoven Woodward Chevrolet, Inc v Dunkirk*, 351 Mich 190; 88 NW2d 408 (1958); *People v Rocha*, 110 Mich App 1; 312 NW2d 657 (1981). "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v Seldin*, 422 US 490, 499; 95 S Ct 2197; 45 L Ed 2d 343 (1975) (citing *Tileston v Ullman*, 318 US 44; 63 S Ct 493; 87 L Ed 603 [1943]).

[28] *Kowalski v Tesmer*, 543 US 125, 129; 125 S Ct 564; 160 L Ed 2d 519 (2004).

[29] *Id*. (citation omitted).

As is often the case with general rules, there are recognized exceptions. While third-party standing is generally disfavored, federal jurisprudence has permitted, under certain limited circumstances, a litigant to assert the rights of another. In addition to requiring that the litigant establish standing,[30] the litigant must also make two additional showings. First, the litigant must have a sufficiently "close relation to the third party."[31] Second, "there must exist some hindrance to the third party's ability to protect his or her own interests."[32]

Michigan's third-party standing jurisprudence is considerably less developed. In *Mary v Lewis*,[33] a garnishee defendant challenged the constitutionality of a codefendant's prejudgment garnishment. This Court discussed and denied third-party standing to the defendant after discussing factors from a United States Supreme Court *dissenting* opinion:[34]

> As a general rule, one party may not raise the denial of another person's constitutional rights. . . . Defendant quotes portions of Justice Brennan's dissent in *Village of Belle Terre v Boraas*, 416

---

[30] *Singleton v Wulff*, 428 US 106; 96 S Ct 2868; 49 L Ed 2d 826 (1976).

[31] *Powers v Ohio*, 499 US 400, 411; 111 S Ct 1364; 113 L Ed 2d 411 (1991).

[32] *Id.*; *Tesmer*, *supra* at 130.

[33] 399 Mich 401, 416; 249 NW2d 102 (1976).

[34] In *People v Rocha,* 110 Mich App 1; 312 NW2d 657 (1981), the Court of Appeals rejected the defendant's equal protection argument on the basis that the defendant could not assert the constitutional rights of a third party. Inexplicably, the *Rocha* panel did not cite or discuss this Court's decision in *Mary v Lewis*, decided five years earlier. Rather, the panel relied on two law review articles in setting forth the requirements for third-party standing.

US 1; 94 S Ct 1536; 39 L Ed 2d 797 (1974), where two exceptions to this general rule are discussed: first, those situations where there is evidence that the direct consequence of the denial of the constitutional rights of the other would impose substantial economic injury upon the party asserting the right; second, those instances where the litigant's interest and the other's interest intertwine and the latter's rights may not be effectively vindicated in any other manner because they are capable of evading constitutional review.

In this case the bank does not show how it qualifies under either of these exceptions. . . . We therefore conclude that the bank has no standing to interpose the due process rights of the principal defendant regarding the prejudgment garnishment. [399 Mich at 416.]

Thus, the *Mary* Court would permit *jus tertii* where a litigant could establish an economic injury, show that the interests between the litigant and the party possessing the right "intertwine," and show that the third party's rights "are capable of evading constitutional review."

In our judgment, the test utilized by the *Mary* Court is analytically deficient. Requiring that a litigant establish an injury, economic or otherwise, is merely a component of our traditional standing doctrine.[35] Moreover, that the litigant and the third party have "intertwining interests" does not lead to the inference that the party establishing *jus tertii* will be an ardent proponent of the rights of the third party. The third factor is the most curious, for whether a claim is

---

[35] See footnote 13.

capable of evading review is a consideration that is recognized as relevant to mootness, not standing.[36]

Accordingly, we adopt the traditional federal test for third-party standing as articulated in *Tesmer*. A party seeking to litigate the claims of another must, as an initial matter, establish standing under the test established in *Lee*, *supra*.[37] Second, the party must have a "close relationship" with the party possessing the right in order to establish third-party standing. Last, the litigant must establish that there is a "hindrance" to the third party's ability to protect his or her own interests.

As applied to the facts of this case, petitioners cannot meet the requirements of third-party standing and cannot litigate the rights of appellants' insureds. Assuming arguendo that petitioners could satisfy the *Lee* elements,[38] and assuming without deciding that petitioners share a sufficiently "close relationship" with appellants' insureds,[39] there is absolutely no evidence that any obstacle or

---

[36] See *Federated Publications, Inc v City of Lansing*, 467 Mich 98; 649 NW2d 383 (2002); *In re Midland Publishing Co, Inc*, 420 Mich 148; 362 NW2d 580 (1984).

[37] See footnote 13.

[38] Petitioners' amended petition maintains that petitioners are "unable to obtain reasonable access to no-fault insureds." For the purposes of this opinion, we do not address whether this claimed injury is a legally protected interest, as required by *Lee*.

[39] Petitioners maintain that their members "provide reasonably necessary medical care" to appellants' insureds. The patient-physician relationship is frequently deemed sufficiently intimate to permit third-party standing. See *Singleton*, footnote 30 of this opinion (asserting rights of female patients regarding abortion);
(continued…)

14

hindrance prevents appellants' insureds from protecting their own interests through litigation. Therefore, we hold that petitioners do not have standing to assert that the rights of appellants' insureds were violated by appellants' managed care endorsement.

## c. Ripeness

The doctrine of ripeness is closely related to the doctrine of standing, as both justiciability doctrines assess pending claims for the presence of an actual or imminent injury in fact.[40] However, standing and ripeness address different underlying concerns.[41] The doctrine of standing is designed to determine whether a particular party may properly litigate the asserted claim for relief.[42] The doctrine

---

(…continued)

*Griswold v Connecticut*, 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965)(asserting rights of married patients regarding contraceptives).

[40] See *Warth v Seldin*, *supra*, 422 US 499 n 10 (standing "bears close affinity to questions of ripeness"). See also 13A Wright, Miller & Cooper, Fed Practice & Procedure, § 3531.12, p 50, noting that the justiciability doctrines are "tied closely together." See also *Wilderness Society v Alcock*, 83 F3d 386, 390 (CA 11, 1996), noting that the "confusion in the law of standing and ripeness" was "hardly surprising," as both doctrines require actual or imminent injury. However, an "important distinction" existed between the two doctrines.

[41] See *Renne v Geary*, 501 US 312, 320; 111 S Ct 2331; 115 L Ed 2d 288 (1991), which noted that "[j]usticiability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention."

[42] "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Flast v Cohen*, 392 US 83, 99-100; 88 S Ct 1942; 20 L Ed 2d 947 (1968).

of ripeness, on the other hand, does not focus on the suitability of the party; rather, ripeness focuses on the *timing* of the action.[43]

Count II of the petitioners' petition asserts that appellants' managed care option violates the rights of chiropractic providers, including petitioners' membership. As a nonprofit organization, petitioners have standing to litigate on behalf of their members to the degree that their members would have standing as individual plaintiffs.[44] The petition asserts that providers "are entitled to be paid their reasonable and customary charge,"[45] but significantly, appellees assert as

---

[43] "[R]ipeness is peculiarly a question of timing." *Blanchette v Connecticut Gen Ins Corps*, 419 US 102, 140; 95 S Ct 335; 42 L Ed 2d 320 (1974). See also *Navegar, Inc v United States,* 322 US App DC 288, 292; 103 F3d 994 (1997) (ripeness "focuses on the timing of the action rather than on the parties seeking to bring it"); *Peoples Rights Organization, Inc v City of Columbus,* 152 F3d 522 (CA 6, 1998); *Wilderness Society*, *supra* at 390, noting that "[w]hen determining ripeness, a court asks whether this is the correct *time* for the complainant to bring the action." (Emphasis in original.)

[44] *Nat'l Wildlife*, *supra,* 471 Mich 629. Appellants ask this Court to adopt the holding of *Hunt v Washington State Apple Advertising Comm,* 432 US 333; 97 S Ct 2434; 53 L Ed 2d 383 (1977), requiring additional elements to establish organizational standing. However, because we resolve this issue on ripeness grounds, we need not address the propriety of adopting *Hunt*.

[45] To the degree that petitioners seek relief based on the customary charges of their membership, the Court of Appeals panel below determined that petitioners' argument failed in light of *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 377; 670 NW2d 569 (2003). See 262 Mich App 246 n 12. *Advocacy Org* was affirmed by this Court, with all six participating justices concluding that reasonable, rather than customary, fees are compensable. 472 Mich 91; 693 NW2d 358 (2005). Additionally, petitioners did not appeal the Court of Appeals ruling, nor did they file a cross-appeal. Therefore, the issue is not properly before us and will not be further reviewed. *Therrian v Gen Laboratories*, *Inc,* 372 Mich 487; 127 NW2d 319 (1964).

(continued…)

16

their injury that appellants' policy endorsement violates MCL 500.3157 by reimbursing providers at a rate less than their *customary charge*.[46] Review of the record in this case reveals no evidence that any of petitioners' members have experienced an actual injury as a result of appellants' policy endorsement. Because petitioners seek relief for a hypothetical injury, the ripeness of the claim comes into question.

The ripeness doctrine is supported by both constitutional and prudential principles.[47]   As a threshold matter, the Michigan Constitution permits the judiciary to exercise only "judicial power," the "most critical element" of which is

---

(…continued)

[46] As noted in footnote 45 of this opinion, the statute permits a medical provider to charge a reasonable amount for its services. MCL 500.3157 provides:

> A physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person for an accidental bodily injury covered by personal protection insurance, and a person or institution providing rehabilitative occupational training following the injury, may charge a reasonable amount for the products, services and accommodations rendered. The charge shall not exceed the amount the person or institution customarily charges for like products, services and accommodations in cases not involving insurance.

[47] See *Nat'l Park Hospitality Ass'n v Dep't of Interior*, 538 US 803, 807; 123 S Ct 2026; 155 L Ed 2d 1017 (2003). The prudential considerations require that a court consider both "'the fitness of the issues for judicial decision'" and "'the hardship to the parties of withholding court consideration . . . .'" *Thomas v Union Carbide*, *supra* at 581 (citation omitted).

the requirement that a genuine controversy exist between the parties.[48]  A claim

lacks ripeness, and there is no justiciable controversy, where "the harm asserted

has [not] matured sufficiently to warrant judicial intervention . . . ."[49]

Petitioners' allegation that appellants' policy endorsement violates the

rights of their members in violation of MCL 500.3157 is not yet ripe for review.

Nothing in the record before us indicates that petitioners' members have in fact

been reimbursed at less than a reasonable amount.  The lack of ripeness is further

buttressed by the particularly fact-intensive nature of petitioners' claim. MCL

500.3157 provides that chiropractors "may charge a reasonable amount" for

services rendered.  Petitioners have the burden of establishing the reasonableness

of their members' charges in order to impose liability on the insurer.[50] Moreover,

questions surrounding the reasonableness of petitioners' members' charges are

factual in nature and must be resolved by the jury.[51] Because the record is

completely devoid of any facts supporting an actual or imminent injury in fact, we

---

[48] *Nat'l Wildlife*, *supra*, 471 Mich 615. See also *Thomas v Union Carbide*, *supra* at 579 (ripeness must be established "[a]s a threshold matter").

[49] *Warth v Seldin*, 422 US 490, 499 n 10; 95 S Ct 2197; 45 L Ed 2d 343 (1975).

[50] *Nasser v Auto Club Ins Ass'n*, 435 Mich 33; 457 NW2d 637 (1990).

[51] *Id*.

18

conclude that petitioners' claim is not ripe for review at this juncture and is not justiciable.[52]

## IV. Conclusion

Issues of justiciability concern the judiciary's constitutionally delineated jurisdiction to exercise only "judicial power" and hear only cases involving an actual controversy. Therefore, questions of justiciability may be raised at any stage in the proceedings and may not be waived by the parties.

Regarding count I, we hold that petitioners do not satisfy the test for third-party standing, and may not litigate on behalf of appellants' insureds. In count II, petitioners assert the rights of their members. Assuming that petitioners could otherwise litigate the claims of their members, petitioners have not established an actual or imminent injury; thus, the claim is not ripe for review.

We therefore vacate the judgments of the circuit court and the Court of Appeals and reinstate the decision of the Commissioner.

Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan

---

[52] See *Johnson v Muskegon Hts,* 330 Mich 631, 633; 48 NW2d 194 (1951) (Courts generally "will not decide a case or question, in or on which there is no real controversy" because "'[i]t is not our duty to pass on moot questions or abstract propositions.'" [Citation omitted.]).

STATE OF MICHIGAN

SUPREME COURT

MICHIGAN CHIROPRACTIC COUNCIL and
MICHIGAN CHIROPRACTIC SOCIETY,

     Petitioners-Appellees,

v                                          No. 126530-1

COMMISSIONER OF THE OFFICE OF
FINANCIAL AND INSURANCE SERVICES,

     Respondent,

and

FARMERS INSURANCE EXCHANGE and
MID-CENTURY INSURANCE COMPANY

     Intervenors-Respondents-Appellants.
_____

KELLY, J. (*concurring in the result only*).

I agree with the result reached by the majority. However, I continue to have concerns with the judicial test for standing this Court adopted in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 747; 629 NW2d 900 (2001) (Kelly, J., dissenting).

The test in *Lee* incorporates the requirements set forth in *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992). Under *Lee*, a plaintiff seeking standing must establish an actual or imminent injury that is

concrete and particularized. There must be a causal connection between the defendant's action and the plaintiff's injury, and the injury must be one for which the court can provide redress. As I stated in my concurrence in result only in *Nat'l Wildlife Federation & Upper Peninsula Environmental Council v Cleveland Cliffs Iron Co*,[1] I have come to believe that *Lee* wrongly adopted in toto these federal standing requirements.

By adopting the *Lujan* "case" and "controversy" rule, the Court creates impediments to access to Michigan courts not found in our Constitution. There is no mandatory particularized injury requirement for standing under either the federal or state constitutions. See my opinion in *Nat'l Wildlife*, *supra* at 682-683.

I still believe that Michigan's standing requirements before *Lee* were sufficient and that *Lee* wrongly blocks access to our state courts.

Marilyn Kelly

---

[1] 471 Mich 608, 676; 684 NW2d 800 (2004).

2

S T A T E   O F   M I C H I G A N

SUPREME COURT

MICHIGAN CHIROPRACTIC COUNCIL
and MICHIGAN CHIROPRACTIC
SOCIETY,

     Petitioners-Appellees,

v                                   No. 126530-1

COMMISSIONER OF THE OFFICE OF
FINANCIAL AND INSURANCE
SERVICES,

     Respondent,

and

FARMERS INSURANCE EXCHANGE and
MID-CENTURY INSURANCE COMPANY

     Intervenors-Respondents-Appellants.
_____

WEAVER, J. *(concurring with the result only and dissenting in part)*.

I concur with the result reached by the majority.  But I strongly dissent from its reasoning and analysis.

In *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co,* 471 Mich 608; 684 NW2d 800 (2004), a majority of four justices fundamentally changed and heightened the burden of standing to pursue causes of action when they superimposed the federal constitutional "case or controversy" standing constraints on the plaintiffs.

Today the majority is again expanding its earlier, incorrect, decisions in *Lee v Macomb Co Bd of Comm'rs,* 464 Mich 726; 629 NW2d 900 (2001), and *Nat'l Wildlife Federation.* In *Lee* and *Nat'l Wildlife Federation* the majority imposed the United States Constitution's "cases and controversies" restrictions on standing in Michigan courts. This change of law constitutionalized Michigan's standing doctrine, which was formerly a prudential limitation. Relying on *Nat'l Wildlife,* the same majority narrowed who qualifies as an "aggrieved party" for the purpose of invoking the appellate jurisdiction of this Court in *Federated Ins Co v Oakland Co Rd Comm,* 475 Mich __; __ NW2d __ (2006).

The majority now compounds these errors by transforming the prudential doctrines of mootness[1] and ripeness[2] into constitutionally based doctrines that affect the jurisdiction of the Court. See *ante* at 6-10.

When the mootness and ripeness doctrines are viewed as prudential limits, a state court has *discretion* in applying those doctrines. By contrast, the "case or controversy" clause in US Const, art III, § 2 *requires* federal courts to dismiss cases that are moot or not ripe. By transforming the doctrines of mootness and

---

[1] "Generally, an action is considered 'moot' when it no longer presents a justiciable controversy because issues involved have become academic or dead." Black's Law Dictionary (6th ed), p 1008.

[2] Ripeness refers to the threshold conditions that must exist before a dispute is sufficiently mature to enable a court to decide it on the merits. Maraist, *Environmental and land use law: The ripeness doctrine in Florida land use law,* 71 Fla B J 58 (February, 1997).

2

ripeness into constitutional requirements, the majority requires these doctrines to be treated as jurisdictional issues by the Michigan state courts as well.

The majority states, albeit in dicta, that the mootness doctrine is a justiciability doctrine that concerns the judiciary's constitutional jurisdiction to adjudicate cases. *Ante* at 6, 10. But shifting mootness from a prudential doctrine to a constitutional doctrine conflicts with this Court's most recent decisions concerning mootness. In both *In re Midland Publishing Co, Inc,* 420 Mich 148, 151 n 2; 362 NW2d 580 (1984), and *Federated Publications, Inc v City of Lansing,* 467 Mich 98; 649 NW2d 383 (2002), the Court cited the venerable rule that the Court will not decide moot issues unless the issue is one of public significance that is likely to recur, yet may evade judicial review. However, if the mootness doctrine is one that affects the Court's constitutional jurisdiction, then the Court could not decide a moot issue, regardless of how significant it may be to the public, nor how likely it would be to recur and evade judicial review. See *Honig v Doe,* 484 US 305, 330; 108 S Ct 592; 98 L Ed 2d 686 (1988) (Rehnquist, C.J., concurring) ("If it were indeed Art. III which--by reason of its requirement of a case or controversy for the exercise of federal judicial power--underlies the mootness doctrine, the 'capable of repetition, yet evading review' exception relied upon by the Court in this case would be incomprehensible. Article III extends the judicial power of the United States only to cases and controversies; it does not except from this requirement other lawsuits which are 'capable of repetition, yet evading review.'").

The majority asserts that the ripeness doctrine "is supported by both constitutional and prudential principles." *Ante* at 17. In the *federal* courts the ripeness doctrine is based on both art III "case or controversy" limitations on judicial power and on prudential reasons for refusing to exercise jurisdiction. *Regional Rail Reorganization Act Cases,* 419 US 102, 138; 95 S Ct 335; 42 L Ed 2d 320 (1974). But, as I explained in *Nat'l Wildlife,* the federal constitution's art III, § 2 limitations apply to the federal court's judicial power; they do not apply to the power of Michigan's state courts. *Nat'l Wildlife, supra* at 660-661 (Weaver, J., concurring in result only). Thus, while the federal court's ripeness doctrine involves both the "case or controversy" requirement of art III, § 2 of the federal constitution and prudential concerns, *Duke Power Co v Carolina Environmental Study Group, Inc,* 438 US 59, 81-82; 98 S Ct 2620; 57 L Ed 2d 595 (1978), Michigan's courts need only consider prudential concerns. Further, for the same reasons explained above, holding that the ripeness doctrine is based on constitutional grounds is inconsistent with this Court's recognition that a showing of futility may trigger an exception to the ripeness doctrine. See *Paragon Properties Co v City of Novi,* 452 Mich 568, 581-583; 550 NW2d 772 (1996) (considering, but rejecting, the futility argument), and *Lucas v South Carolina Coastal Council,* 505 US 1003, 1014 n 3; 112 S Ct 2886; 120 L Ed 2d 798 (1992).

For these reasons I concur only in the result of the majority opinion, and dissent from the majority's reasoning and analysis that mistakenly transforms the

4

prudential doctrines of mootness and ripeness into constitutionally based doctrines that affect the jurisdiction of the Court.

Elizabeth A. Weaver

S T A T E   O F   M I C H I G A N

SUPREME COURT

MICHIGAN CHIROPRACTIC COUNCIL
and MICHIGAN CHIROPRACTIC
SOCIETY,

 Petitioners-Appellees,

v           No. 126530-1

COMMISSIONER OF THE OFFICE OF
FINANCIAL AND INSURANCE
SERVICES,

 Respondent,

and

FARMERS INSURANCE EXCHANGE and
MID-CENTURY INSURANCE COMPANY

 Intervenors-Respondents-Appellants.
_____

CAVANAGH, J. (*concurring with part of the result and dissenting in part*).

I concur with the result reached by the majority with respect to count I of the petition. However, I respectfully dissent from the majority's position regarding count II. Petitioners allege that respondent Farmers Insurance Exchange sought to reduce the use of chiropractic services by improperly limiting access to chiropractic providers and by improperly determining rates to be paid to chiropractic providers, contrary to the no-fault act. See MCL 500.3107(1)(a); MCL 500.3157. Because I believe these allegations are sufficient to confer

standing on petitioners to pursue count II, I disagree with the majority's decision to not reach the merits of petitioners' claim.

Michael F. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

MICHIGAN CHIROPRACTIC COUNCIL and
MICHIGAN CHIROPRACTIC SOCIETY,

 Petitioners-Appellees,

v                No. 126530-1

COMMISSIONER OF THE OFFICE OF
FINANCIAL AND INSURANCE SERVICES,

 Respondent,

and

FARMERS INSURANCE EXCHANGE and
MID-CENTURY INSURANCE COMPANY

 Intervenors-Respondents-Appellants.
_____

MARKMAN, J. (*concurring in part and dissenting in part*).

I concur in both the analysis and the result reached by the lead opinion with respect to count I of the petition. However, with respect to count II, I do not believe that the traditional justiciability analysis that is normally applied to inquiries under Const 1963, art 6, § 1 is necessarily sufficient to dispose of the questions presented. Because I would order additional briefing and reargument on these questions, I cannot join in the lead opinion's analysis and results with respect to count II.

I. Background

Intervening respondents Farmers Insurance Exchange and Mid-Century Insurance Company offered an endorsement to their no-fault automobile policies in which insureds agreed to accept medical care from a network of preferred provider organizations (PPOs) in exchange for a 40 percent discount in their premiums. Petitioners Michigan Chiropractic Council and Michigan Chiropractic Society filed a request with respondent Commissioner of the Office of Financial and Insurance Services to conduct a contested-case hearing and invalidate the endorsement as being contrary to the no-fault act, MCL 500.3101 *et seq.*

The commissioner concluded that there was nothing improper about the endorsement and declined to conduct a hearing. Included in the commissioner's written order were findings of fact and conclusions of law addressing several of petitioners' arguments. With respect to petitioners' claim that the endorsement violated the rights of the insureds (count I), the commissioner concluded that the endorsement was not inherently inconsistent with MCL 500.3107 (setting forth the type of benefits a no-fault insurer is liable for under the act). With respect to petitioners' claim that the endorsement violated the rights of medical providers (count II), the commissioner concluded that nothing in the no-fault act, including MCL 500.3157 (detailing allowable provider charges), conferred the right on any provider to be chosen to provide care, that nothing in the endorsement conflicted with the requirement that no-fault insurers pay reasonable and customary charges,

and that the endorsement did not unreasonably or deceptively affect the risk purportedly assumed.[1]

The trial court reversed the commissioner, ruling that the endorsement was inconsistent with the no-fault act, and the Court of Appeals affirmed in a published opinion. *Mich Chiropractic Council v Comm'r of the Office of Financial and Ins Services,* 262 Mich App 228; 685 NW2d 428 (2004). The Court of Appeals concluded that the PPO option violated the no-fault act because it (1) limited an insured's choice of medical providers and (2) could mislead consumers about the potential savings to be achieved in selecting this option.

We granted leave to appeal, directing the parties to include among the issues to be addressed

> (1) whether an optional managed care endorsement such as that offered by intervenors is permissible under the no-fault act, MCL 500.3101 *et seq*., (2) whether the Court of Appeals erred in relying on its finding that the endorsement is potentially deceptive and misleading, (3) whether petitioners have standing to bring their petition, in light of some number of their members having participated in the managed care program, or any other reason affecting standing, and whether petitioners have standing with regard to all or only some of the counts in their petition, and (4) the standard of review to be applied by the circuit court to the administrative decision denying the petition. [472 Mich 899 (2005).]

---

[1] The commissioner's findings with respect to counts III and IV are omitted because those findings are not at issue on appeal here.

3

## II. Standard of Review

Whether a party has standing and whether a dispute falls within the scope of the "judicial power" are constitutional questions, which we review de novo. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 612; 684 NW2d 800 (2004); *Warda v Flushing City Council*, 472 Mich 326, 330; 696 NW2d 671 (2005).

## III. Analysis

The lead opinion focuses on justiciability inquiries usually raised in the context of questions regarding the scope of this Court's "judicial power." Const 1963, art 6, § 1. As noted by the lead opinion, whether the resolution of a case is within the "judicial power" is usually the dispositive inquiry with respect to whether this Court possesses jurisdiction over a claim, i.e., whether the claim is justiciable. *Ante* at 9-10. The "judicial power" is traditionally understood as the authority of the courts to adjudicate cases or controversies of, and to provide meaningful relief to, parties who have a concrete and present interest in the outcome of a dispute. See *Nat'l Wildlife Federation, supra* at 614-615.

However, while most matters cognizable by this Court fall within this traditional scope of the "judicial power," our jurisdiction is not always so defined. In certain instances, the Michigan Constitution specifically permits or requires the judiciary to take cognizance of actions that fall outside the traditional understanding of the "judicial power." For instance, Const 1963, art 3, § 8 permits this Court to render advisory opinions "as to the constitutionality of legislation

4

after it has been enacted into law but before its effective date."[2]  See, e.g., *In re Request for Advisory Opinion On Constitutionality of 2005 PA 71*, 474 Mich 1230 (2006); *Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich 93; 422 NW2d 186 (1988); see also *In re Certified Question (Melton v Prime Ins Syndicate, Inc)*, 472 Mich 1225 (2005).  Although an advisory opinion is outside the scope of the traditional "judicial power," because there is no present case or controversy, this does not preclude us from entertaining such a case in light of the language of our Constitution effectively redefining the "judicial power" in Michigan.

With this in mind, I believe that significant questions arise with respect to whether the judiciary can-- or must-- take cognizance of the petitioners' claims under Const 1963, art 6, § 28, which, at least on its face, does not seem to require that we engage in the usual justiciability inquiries.[3]  Const 1963, art 6, § 28, provides in part:

---

[2] That provision provides, in its entirety:

> Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.  [Const 1963, art 3, § 8.]

[3] The justices in the lead opinion apparently believe that, because the parties have not raised this issue, we need not reach it.  However, it has long been the practice of this Court to raise issues sua sponte where consideration of such issues is necessary to a full and fair determination of the case before it.  See, e.g., *City of Dearborn v Bacila*, 353 Mich 99, 118; 90 NW2d 863 (1958); *Auditor*

(continued…)

5

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

The use of the word "shall" indicates a mandatory and imperative directive. *Burton v Reed City Hosp Corp*, 471 Mich 745, 752; 691 NW2d 424 (2005). What is "provided by law" under the Insurance Code is that final decisions will be subject to judicial review under Michigan's Administrative Procedures Act (APA), MCL 24.201 *et seq.*:

> A person aggrieved by a final order, decision, finding, ruling, opinion, rule, action, or inaction provided for under this act may seek judicial review in the manner provided for in chapter 6 of the

---

(…continued)
*General v Bolt*, 147 Mich 283, 286-287; 111 NW 74 (1907). "Where the adversarial process fails to provide valuable assistance, a court's duty to correctly expound the law is not excused." *Mack v Detroit*, 467 Mich 1211, 1213 (2002) (Young, J., concurring).

Moreover, questions relating to subject-matter jurisdiction, in particular questions of a constitutional dimension, may be raised at any time by the parties, or sua sponte by a court. *Nat'l Wildlife Federation, supra* at 630; MCR 2.116(D)(3). Subject-matter jurisdiction involves the power of a court to hear and determine a cause or matter. *Langdon v Wayne Circuit Court Judges*, 76 Mich 358, 367; 43 NW 310 (1889). It is conferred on the court by the authority that established such court. *Detroit v Rabaut*, 389 Mich 329, 331; 206 NW2d 625 (1973). Const 1963, art 6, § 1 established the current judicial system in Michigan, and Const 1963, art 6, § 28 provides that certain agency decisions "shall be subject to direct review by the courts . . . ." Accordingly, it is entirely appropriate, in my judgment, that we address the effect of Const 1963, art 6, § 28 on the issues presented.

administrative procedures act of 1969, 1969 PA 306, MCL 24.301 to 24.306. [MCL 500.244(1).]

The APA, in turn, provides that

[w]hen a person has exhausted all administrative remedies available within an agency, and is aggrieved by a final decision or order in a contested case, whether such decision or order is affirmative or negative in form, the decision or order is subject to direct review, by the courts as provided by law. Exhaustion of administrative remedies does not require the filing of a motion or application for rehearing or reconsideration unless the agency rules require the filing before judicial review is sought. A preliminary, procedural or intermediate agency action or ruling is not immediately reviewable, except that the court may grant leave for review of such action if review of the agency's final decision or order would not provide an adequate remedy. [MCL 24.301.]

Here, the commissioner denied petitioners' request for a contested-case hearing, finding that they had failed to demonstrate probable cause in support of their request. However, rather than simply declining to hold a hearing, the commissioner proceeded to conclude, as a matter of law, that respondents' PPO option did not violate the Insurance Code.[4]

---

[4] In so doing, the commissioner was apparently acting pursuant to his authority under MCL 500.2236(5), which provides, in part:

Upon written notice to the insurer, the commissioner may disapprove, withdraw approval or prohibit the issuance, advertising, or delivery of any form to any person in this state if it violates any provisions of this act, or contains inconsistent, ambiguous, or misleading clauses, or contains exceptions and conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy.

The commissioner noted in his decision that he possessed the authority to withdraw approval of insurance policy forms pursuant to MCL 500.2236, and that

(continued…)

7

It seems reasonably clear that the commissioner's order here constituted a "final order, decision, finding, ruling, opinion, rule, action, or inaction," MCL 500.244(1), and fell within the scope of "final decisions, findings, rulings and orders of any administrative officer or agency . . . ." Const 1963, art 6, § 28. Given that the commissioner's order contained findings of fact and conclusions of law, it also seems fair to characterize this order as "judicial or quasi-judicial" in nature. *Id.*

In light of the foregoing then, a number of questions arise:

(1) Does the fact that we are dealing with a "final decision[] . . . of [an] administrative officer or agency," Const 1963, art 6, § 28, authorize judicial review of the commissioner's order independently of the justiciability inquiry required for cases traditionally heard pursuant to the "judicial power"? In other words, *may* this Court take cognizance of petitioners' claims by virtue of Const 1963, art 6, § 28 and the APA, without regard to whether these claims are ripe and without regard to whether the parties have *Cleveland Cliffs* standing? Indeed, *must* we take cognizance of these claims? Moreover, if Const 1963, art 6, § 1 *does* require the judiciary to consider a case such as the instant one, does this raise the

_____

(…continued)
in their complaint, petitioners specifically sought the withdrawal of the endorsement at issue under that section. Because the commissioner's findings and conclusions went far beyond what was necessary to simply deny petitioners' request for a contested-case hearing under MCL 500.2028 and 500.2029, I can only conclude that such findings were made pursuant to his authority under MCL 500.2236.

8

concern that traditional requirements of standing can be circumvented by the mere tactic of first introducing a dispute into the administrative process? Would, for example, the *brother* of a chiropractor who challenged the administrative rule at issue in this case be equally empowered upon an adverse decision by the commissioner to pursue a judicial appeal?

(2) Notwithstanding Const 1963, art 6, § 28, to what extent, if any, is the commissioner's decision subject to judicial review? In addition to presenting a significant issue concerning the relationship between an administrative agency and the judicial branch of government, this case presents a significant issue concerning the relationship between an administrative agency and the legislative branch of government, namely, whether the Legislature intended that the commissioner's decision to hold a contested-case hearing, or not, constitutes an entirely discretionary and unreviewable decision.

It could be argued, perhaps, that, even if we concluded that petitioners had satisfied justiciability requirements, petitioners would still lack a remedy because the only remedy this Court could conceivably provide would be to order the commissioner to hold a contested-case hearing. However, on initial review, even that relief may be unavailable because the commissioner's decision whether to hold a contested-case hearing would seem to be a discretionary one under MCL 500.2028 and MCL 500.2029, which provide, respectively:

> Upon *probable cause*, the commissioner shall have power to examine and investigate into the affairs of a person engaged in the business of insurance in this state to determine whether the person

9

has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by sections 2001 to 2050. [MCL 500.2028 (emphasis added).]

When the commissioner has *probable cause* to believe that a person engaged in the business of insurance has been engaged or is engaging in this state in an unfair method of competition, or an unfair or deceptive act or practice in the conduct of his business, as prohibited by sections 2001 to 2050, and that a hearing by the commissioner in respect thereto would be in the interest of the public, he shall first give notice in writing, pursuant to Act No. 306 of the Public Acts of 1969, as amended, being sections 24.201 to 24.315 of the Michigan Compiled Laws, to the person involved, setting forth the general nature of the complaint against him and the proceedings contemplated pursuant to sections 2001 and 2050. [MCL 500.2029 (emphasis added).]

The "nondelegation doctrine" forbids the delegation of legislative powers to the executive or judicial branches. *Taylor v Gate Pharmaceuticals*, 468 Mich 1, 8 n 5; 658 NW2d 127 (2003).[5] A delegation of power to an administrative agency is proper only when the controlling statute provides the agency with sufficient standards to effectively transform an administrative agency's decision from a

---

[5] As we noted in *Taylor, supra* at 8-9:

A simple statement of this doctrine is found in *Field v Clark*, 143 US 649, 692; 12 S Ct 495; 36 L Ed 294 (1892), in which the United States Supreme Court explained that "the integrity and maintenance of the system of government ordained by the Constitution" precludes Congress from delegating its legislative power to either the executive branch or the judicial branch. This concept has its roots in the separation of powers principle underlying our tripartite system of government. Yet, the United States Supreme Court, as well as this Court, has also recognized "that the separation of powers principle, and the nondelegation doctrine in particular, do not prevent Congress [or our Legislature] from obtaining the assistance of the coordinate Branches." *Mistretta v United States*, 488 US 361, 371; 109 S Ct 647; 102 L Ed 2d 714 (1989).

legislative decision into an executive decision. *Taylor*, *supra* at 10 n 9; *People v Turmon*, 417 Mich 638, 641-642, 644; 340 NW2d 620 (1983). If there are no such standards, the delegation is improper because the Legislature's powers have been improperly given to an agency of the executive branch. *Blue Cross & Blue Shield of Michigan v Governor*, 422 Mich 1, 53-55; 367 NW2d 1 (1985). In evaluating the sufficiency of legislative standards set forth in an act delegating power to an agency, we presume that the act is constitutional. *Dep't of Natural Resources v Seaman*, 396 Mich 299, 309; 240 NW2d 206 (1976).

MCL 500.2028 and MCL 500.2029 suggest that the commissioner need not hold a hearing except on "probable cause" to believe that unfair practices have occurred or are occurring. Thus, it seems that the commissioner's determination of probable cause is the critical event. We noted in *Warda, supra* at 334, that the courts have no authority to compel an actor belonging to another branch of government to undertake a decision or determination when such decision or determination is purely discretionary. The question naturally arises: Does the commissioner's probable cause determination constitute a purely discretionary determination? Or has the Legislature provided, either explicitly or implicitly, any standards to guide this determination?

In *Warda*, we addressed the obligation of a city council (a legislative entity) to reimburse a police officer for legal fees incurred in defending himself against criminal charges. The officer sought, and the city council denied, reimbursement pursuant to MCL 691.1408(2), which provides:

11

When a criminal action is commenced against an officer or employee of a governmental agency based upon the conduct of the officer or employee in the course of employment, if the employee or officer had a reasonable basis for believing that he or she was acting within the scope of his or her authority at the time of the alleged conduct, the governmental agency *may* pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the action, and to appear for and represent the officer or employee in the action. [Emphasis added.]

In determining that the city council's choice was a "purely discretionary" decision that was not subject to judicial review absent some constitutional infirmity, we reasoned:

The use of the word "may" in § 8 makes clear that the decision to pay an officer's attorney fees is a matter left to the discretion of the municipality. Further, we note that the statute does not limit or qualify the word "may" (with, for instance, a requirement of reasonableness) or provide any other standards by which that discretion is to be exercised. As such, the Flushing city council had full discretion under MCL 691.1408(2) in choosing whether to reimburse plaintiff's attorney fees. [*Warda, supra* at 332.]

We also noted that

[t]he exercise of the "judicial power" by this Court, Const 1963, art 6, § 1, contemplates that there will be standards--legally comprehensible standards--on the basis of which agency decisions can be reviewed. Whether such standards consist of the provisions of the constitution, or the provisions of other pertinent laws, a judicially comprehensible standard is required in order to enable judicial review. [*Id.* at 339.]

Because the Legislature did not include any meaningful standard by which a court could review the exercise of the municipality's discretion, we concluded that the city council's decision to deny reimbursement was not subject to judicial review.

12

Unlike the standardless discretion statutorily afforded the municipality in *Warda*, however, the relevant statutes here provide that "[u]pon probable cause, the commissioner shall have power to examine and investigate," MCL 500.2028, and that "[w]hen the commissioner has probable cause to believe that a person" is engaging in improper practices "and that a hearing by the commissioner in respect thereto would be in the interest of the public," the commissioner shall take certain steps. MCL 500.2029.

In light of this language, can it be said that "probable cause" is, in fact, a *standard* being employed to guide the commissioner's discretion? Or did the Legislature merely intend that "probable cause" serve to define a quantum of proof, and that the commissioner's decision to hold a contested-case hearing is purely discretionary? "Probable cause" is a concept normally found in the criminal law,[6] but it is a well-understood and well-defined concept in our jurisprudence. As such, is "probable cause" a "legally comprehensible standard[] . . . on the basis of which agency decisions can be [judicially] reviewed"? *Warda, supra* at 339. Or does "probable cause" instead establish a burden of proof that petitioners must satisfy? If it is merely a standard of proof, given that trial courts are accustomed to making probable cause determinations, and that appellate courts

---

[6] We have defined "probable cause" as "'a reasonable ground of suspicion, supported by circumstances strong [in themselves] to warrant a cautious person in the belief that the accused is guilty of the offense charged.'" See *People v Richardson*, 469 Mich 923, 929 (2003) (Corrigan, C.J., concurring) (citation omitted).

are accustomed to assessing whether trial courts have correctly established probable cause, does review of the commissioner's determination concerning whether probable cause exists fall squarely within the judicial power? Or should it instead be inferred from the discretionary nature of the "probable cause" decision that the Legislature intended that the commissioner's assessment of "probable cause" be unreviewable? If the Legislature did so intend, does that body have the power to make such a decision unreviewable, given the language of Const 1963, art 6, § 28 and the nondelegation doctrine?

If we were to conclude that the commissioner's ultimate decision in this case-- denying the petition for a contested-case hearing and ruling that the PPO option was valid-- was authorized by law-- i.e., because no probable cause was found, the commissioner was not required to hold a hearing-- is judicial review precluded upon that determination? Or does the ultimate question remain whether this is a "case[] in which a hearing is required"? Const 1963, art 6, § 28. If the latter is the case, would that require that we review the commissioner's determination of a lack of probable cause? If so, would that decision be reviewed under the standard of "competent, material and substantial evidence on the whole record"? Have petitioners here shown that they have actually been harmed by the endorsement at issue, such that the commissioner's determination was not supported by "competent, material and substantial evidence on the whole record"? Must they?

14

(3) Of what significance are the commissioner's legal conclusions apart from his decision not to hold a contested-case hearing? Even if we were to conclude that the commissioner's probable cause determination was discretionary and therefore unreviewable, it appears that MCL 500.2028 and MCL 500.2029 are not the only provisions relied on by the commissioner in reaching the decision. The commissioner also asserted that he possessed the authority to withdraw approval of insurance policy forms pursuant to MCL 500.2236(5). That provision provides:

> Upon written notice to the insurer, the commissioner may disapprove, withdraw approval or prohibit the issuance, advertising, or delivery of any form to any person in this state if it violates any provisions of this act, or contains inconsistent, ambiguous, or misleading clauses, or contains exceptions and conditions that unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy. The notice shall specify the objectionable provisions or conditions and state the reasons for the commissioner's decision. If the form is legally in use by the insurer in this state, the notice shall give the effective date of the commissioner's disapproval, which shall not be less than 30 days subsequent to the mailing or delivery of the notice to the insurer. If the form is not legally in use, then disapproval shall be effective immediately.

The commissioner proceeded to conclude-- apparently pursuant to his authority under MCL 500.2236-- that the PPO option did not violate the Insurance Code. With respect to petitioners' claim that the endorsement violated the rights of insureds (count I), the commissioner found that the endorsement was not inherently inconsistent with MCL 500.3107. With respect to petitioners' claim that the endorsement violated the rights of medical providers (count II), the

15

commissioner concluded that nothing in the no-fault act, including MCL 500.3157, conferred the right on any provider to be chosen to provide care, that nothing in the endorsement conflicts with the requirement that no-fault insurers pay reasonable and customary charges, and that the endorsement does not unreasonably or deceptively affect the risk purportedly assumed.

Thus, it appears that the commissioner did not merely decline to hold a contested-case hearing; rather, he also affirmatively reached a number of legal conclusions. Because petitioners are challenging these conclusions, and not simply the failure to hold a hearing, I am not certain that the arguably discretionary nature of the commissioner's authority to hold a contested-case hearing under MCL 500.2028 and MCL 500.2029 is dispositive of the justiciability inquiry. Rather, if petitioners are "aggrieved by a final order, decision, finding, ruling, opinion, rule, action, or inaction provided for under this act," MCL 500.244(1), are they not entitled to proceed under the APA?

(4) Finally, are petitioners even "aggrieved" pursuant to MCL 500.244(1)? How is this determination made? Might this ultimately boil down to the equivalent of a justiciability inquiry? That is, can it be argued that an adverse decision at the administrative level is the equivalent of a "present injury" required to meet the standing and ripeness requirements?[7] Might it also be argued that an

---

[7] At first blush, this position would appear to be consistent with the use of "aggrieved" in MCR 7.203(A), as interpreted recently in *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich ___ ; ___ NW2d ___ (2006), in that it suggests

(continued…)

16

adverse decision below-- even a decision on a matter that could not have been brought before the judiciary because it was otherwise not justiciable-- *itself* constitutes a present injury?

I believe these questions present constitutional issues that must be resolved for a proper determination of the case before us, and that they are not addressed, much less resolved, by the lead opinion. In my judgment, further briefing is required by the parties and further consideration is required by this Court.

## IV. Conclusion

I do not believe that the justiciability analysis that is traditionally applied to inquiries under Const 1963, art 6, § 1 is necessarily dispositive in this case.

---

(…continued)
that one is "aggrieved" when one has suffered an adverse decision below. MCR 7.203(A) provides that the Court of Appeals has jurisdiction of an appeal of right by an "aggrieved party" of:

> (1) A final judgment or final order of the circuit court, or court of claims, as defined in MCR 7.202(6), except a judgment or order of the circuit court
>
> (a) on appeal from any other court or tribunal;
>
> (b) in a criminal case in which the conviction is based on a plea of guilty or nolo contendere;
>
> An appeal from an order described in MCR 7.202(6)(a)(iii)-(v) is limited to the portion of the order with respect to which there is an appeal of right.
>
> (2) A judgment or order of a court or tribunal from which appeal of right to the Court of Appeals has been established by law or court rule.

17

Rather, a number of constitutional questions concerning the administrative process in Michigan exist apart from this analysis, and these questions should be resolved for a proper determination of the case before us. The lead opinion fails to address, much less answer, these questions. As such, I believe additional consideration by this Court is warranted, and I would direct the parties to file supplemental briefs on the issues raised in this opinion.

Stephen J. Markman